Filed:  June 30, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Petitioner on Review,

v.

JOHN RICHARD DAVIS,

Respondent on Review.

(CC06CR1271FE; CA A138968; SC S058572)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 13, 2011.

Paul L. Smith, Assistant Attorney-in-Charge Criminal Appeals, argued the cause for petitioner on review.  With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

David A. Hill, Eugene, argued the cause and filed the brief for respondent on review.

LANDAU, J.

The decision of the Court of Appeals is reversed.  The order of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____

*Appeal from Douglas County Circuit Court, William L. Lasswell, Judge. 234 Or App 106, 227 P3d 204 (2010).

LANDAU, J.

In this criminal case, the police informed defendant that he was the subject of an investigation for sexual abuse. Defendant retained counsel, who sent a letter to the police invoking defendant's right to remain silent and directing the police to discuss the matter with counsel. Months later, the police obtained incriminating statements from defendant without the presence of his counsel by monitoring his communications with the victim. At issue is whether the police, in obtaining those incriminating statements from defendant, violated his right against self-incrimination and right to counsel under Article I, sections 12 and 11, respectively, of the Oregon Constitution. The trial court concluded that, in light of defendant's earlier invocation of his right to remain silent and right to counsel, the police obtained the incriminating statements in violation of both constitutional provisions. The Court of Appeals affirmed. *State v. Davis*, 234 Or App 106, 227 P3d 204 (2010). We conclude that the right against self-incrimination under Article I, section 12, bars police questioning only when a defendant is in custody or otherwise in compelling circumstances. We further conclude that the right to counsel under Article I, section 11, bars police questions outside the presence of counsel only once "criminal proceedings" have begun, which, at the earliest, is the time of a suspect's arrest. We therefore reverse and remand for further proceedings.

## I. FACTS

We recite the facts consistently with the trial court's findings. *State v. Bost*, 317 Or 538, 541, 857 P2d 132 (1993). On November 18, 2003, the alleged victim, then 17 years old, reported to Roseburg Police Detective Kaney that her stepfather, defendant,

1

had been sexually abusing her since she was five or six years old. A few days later, Kaney contacted defendant by phone to discuss the allegations. Defendant asked Kaney if there was a warrant out for his arrest and whether he needed an attorney. Kaney responded that defendant was not "wanted" and that it was up to defendant to decide if he wanted an attorney.

On December 31, 2003, Kaney received a letter from attorney Charles Lee. In that letter, Lee stated that he represented defendant, and that Lee was aware that defendant's stepdaughter, the victim, had made sexual abuse allegations against defendant. Lee invoked defendant's right to remain silent, directing Kaney to "not talk to [defendant] except through me." He also stated that "[i]f you need to do an interview I will be happy to help arrange it." Kaney continued his investigation, but did not directly contact defendant.

Eight months later, in August 2004, the victim reported to Kaney that defendant had contacted her through her instant messaging service. Kaney believed that defendant would try to contact the victim again, so he asked her to come to his office twice a week to engage in monitored instant message conversations with defendant. She agreed. Kaney instructed the victim regarding the persona she should portray to defendant, with the hope that it would encourage defendant to make statements that would be probative in the sexual abuse investigation. Although most of the statements during those monitored instant message conversations were unscripted small talk between the victim and defendant, at times, Kaney directed the victim to say certain things with the purpose of eliciting potentially incriminating statements. In total, the victim and

2

defendant had three instant message conversations, as well as two monitored phone calls.

During those conversations, defendant made several incriminating statements. Based on those statements, Kaney obtained a warrant to search defendant's instant messaging account for evidence showing that he was the person using the service to communicate with the victim. Ultimately, defendant was charged with five counts of sodomy in the first degree, six counts of rape in the first degree, two counts of sexual abuse in the first degree, and one count of contributing to the sexual delinquency of a minor.

Defendant moved to suppress the evidence derived from his monitored conversations with the victim and any evidence discovered through the execution of the search warrant. Defendant argued that, because he had invoked his constitutional rights to counsel and to remain silent eight months earlier, the police thereafter were obligated not to communicate with him except through counsel. According to defendant, the police, having nevertheless elicited incriminating statements from him through the pretextual communications with the victim, violated those constitutional rights. The trial court agreed and granted defendant's motion to suppress, holding that the police had violated defendant's Article I, section 11, right to counsel and his Article I, section 12, right to remain silent by questioning him, through the victim, without his attorney present.

The state appealed. ORS 138.060(1)(c). The state argued that, because no formal charges had been filed against defendant at the time the incriminating statements had been elicited from him, no right to counsel under Article I, section 11, had been

3

implicated. The state argued that its facilitation of the pretextual conversations did not implicate Article I, section 12, either, because the right against self-incrimination guaranteed by the state constitution applies only when a defendant is in trial or otherwise in compelling circumstances, and no such circumstances occurred in this case.

The Court of Appeals affirmed, but held only that the police violated defendant's right against self-incrimination under Article I, section 12. The court held that the scope of the right against self-incrimination guaranteed by that provision is not limited to compelling circumstances. In the court's view, "[w]hen a person, *not in a compelling setting*, unequivocally invokes the right to remain silent as to an ongoing investigation conducted by a police officer, the police officer must respect that assertion of the right to remain silent if the police officer is personally aware of that invocation." *Davis*, 234 Or App at 113 (emphasis added). The court concluded that, because, in this case, Kaney had received a letter from defendant's counsel invoking defendant's right to remain silent, thereafter Kaney could not constitutionally contact defendant except through counsel. *Id.* at 113-14. The court did not address whether the police had violated defendant's right to counsel under Article I, section 11.

The state petitioned this court for review, arguing that the Court of Appeals erred in holding that the police violated Article I, section 12. According to the state, a defendant's constitutional right to remain silent applies only when a defendant is in custody or other compelling circumstances. Applying that principle, the state asserts that the attempt by defendant's attorney to invoke defendant's right to remain silent did not prevent the police from later reinitiating contact, because at no time was defendant in

4

custody. Additionally, the state asserts that, during the conversations with the victim, defendant was not in compelling circumstances because he did not know that the victim was working as an agent for the police. Therefore, the state argues, the Court of Appeals erred in holding that Article I, section 12, applied outside the context of compelling circumstances, and the incriminating statements made by defendant should not have been suppressed.

Defendant responds that, although this court has not yet held that the right against self-incrimination protected under Article I, section 12, applies in noncompelling circumstances, it should do so in this case. Defendant notes that, in a footnote in *State v. Sparklin*, 296 Or 85, 92 n 9, 672 P2d 1182 (1983), this court suggested that the right to an attorney under Article I, section 11, is as important during the investigative phase of a case as it is during the trial itself. In a similar way, defendant reasons, the right to remain silent is just as important during the investigative phase as it is during trial.

Defendant also argues (albeit fleetingly) that, even if the Court of Appeals erred in concluding that his statements were obtained in violation of his right against self-incrimination under Article I, section 12, the court's conclusion with respect to the suppression of those statements still is correct on the alternative ground that the statements were obtained in violation of his right to counsel under Article I, section 11.[1]

---

[1] This court has recognized a right to counsel that derives from the right against self-incrimination under Article I, section 12, during custodial interrogation. *See, e.g.*, *State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007). Defendant, however, does not advance any arguments concerning that right.

## II.  ANALYSIS

A.      *Article I, Section 12, Right Against Self-incrimination*

We begin with the parties' contentions concerning the state constitutional right against self-incrimination.  In *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), this court held that, when construing a provision of the original Oregon Constitution, we engage in a three-part analysis of it.  We examine the text in its context, the historical circumstances of the adoption of the provision, and the case law that has construed it.  *Id.*  Our goal is to ascertain the meaning most likely understood by those who adopted the provision.  The purpose of that analysis is not to freeze the meaning of the state constitution in the mid-nineteenth century.  Rather it is to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances.  *State v. Hirsch/Friend*, 338 Or 622, 631, 114 P3d 1104 (2005).

Several prior decisions of this court have alluded to the history of Article I, section 12.  *See, e.g.*, *State v. Vondehn*, 348 Or 462, 236 P3d 691 (2010) (examining history of provision in determining whether violation requires suppression of physical evidence); *State v. Soriano*, 68 Or App 642, 684 P2d 1220, *aff'd and opinion adopted*, 298 Or 392, 693 P2d 26 (1984) (examining history of provision in determining whether state constitution permits the state to compel testimony of a witness in exchange for use or derivative use immunity).  None has engaged in the analysis that *Priest* requires to address the issue presented in this case.  Accordingly, we turn our attention to an analysis of the provision's text, its historical context, and the case law that has construed it to

6

determine whether, as defendant contends and the Court of Appeals held, Article I, section 12, prohibits police from obtaining incriminating statements from a defendant in the absence of compelling circumstances.

Before engaging in that analysis, we pause to emphasize the narrow scope of the issue before us:  An individual always may invoke a "right to remain silent" and refuse to speak with police without the presence of counsel.  The question that we must address is the extent to which the state constitution provides that such invocation or refusal circumscribes the authority of the police in their conduct of an investigation of the individual.  Specifically, our task is to determine whether, under Article I, section 12, a suspect's invocation of a right to remain silent without the assistance of counsel *at a time that he or she is not in custody or in compelling circumstances* precludes the police from nevertheless attempting to obtain incriminating information from that suspect.

1.    Textual Analysis

Article I, section 12, provides, in part:  "No person shall * * * be compelled in any criminal prosecution to testify against himself."  Taken at face value, the provision does not state a broad "right to remain silent."  Rather, it states a much more specific right not to be "compelled" to testify against himself or herself.  Dictionaries published before the adoption of the Oregon Constitution reflect a common understanding of the terms "compel" and "compulsion" that is fairly consistent with their modern definitions.  Webster's, for example, defined "compel" as "[t]o drive or urge with force, or irresistibly; to constrain; to oblige; to necessitate, either by physical or moral force" and defined "compelled" as "[f]orced; constrained; obliged."  Noah Webster, 1 *An American*

7

*Dictionary of the English Language* (1828) (reprint 1970). Bouvier's law dictionary

similarly defined "compulsion" as "[t]he forcible inducement to do an act. *Coercion*[.]"

John Bouvier, 1 *A Law Dictionary Adapted to the Constitution and Laws of the United

States of America* 200 (1839) (reprint 1993) (emphasis in original). Thus, it would

appear that the bare wording of the provision states a prohibition on the manner in which

information may be obtained in a criminal prosecution, *viz.*, it may not be obtained by

force or coercion.

2.      Historical Analysis

That understanding, as it turns out, is consistent with the historical

underpinnings of Article I, section 12. The right against self-incrimination stated in that

provision of the Oregon Constitution is identical to, and presumed to have been based on,

Article I, section 14, of the Indiana Constitution of 1851. Charles Henry Carey, *The

Oregon Constitution* 468 (1926). It was adopted by the framers apparently without

amendment or debate of any sort. Claudia Burton & Andrew Grade, *A Legislative

History of the Oregon Constitution of 1857 -- Part I (Articles I & II)*, 37 Will L Rev 469,

519-20 (2001).

The text of the Indiana provision was taken from Kentucky and Ohio bills

of rights, William P. McLauchlan, *The Indiana State Constitution: A Reference Guide*

46-47 (1996), which were based on the nearly identically worded Fifth Amendment to the

United States Constitution. That amendment provides that "[n]o person * * * shall be

compelled in any criminal case to be a witness against himself[.]" US Const, Amend V.

The Fifth Amendment, in turn, was based on existing state constitutional bills of rights

8

that were adopted following the revolution, notably Section 8 of the Virginia Declaration of Rights, which provided that no man can be "compelled to give evidence against himself." Va Declaration of Rights § 8 (1776). *See generally Soriano*, 68 Or App at 646-47 (tracing history of wording of state constitutional self-incrimination provisions).

The historical roots of the Fifth Amendment, and of the state constitutional provisions on which it was based, are matters of some controversy. *See, e.g.*, John H. Langbein, *The Historical Origins of the Privilege Against Self-Incrimination at Common Law*, 92 Mich L Rev 1047, 1071-72 (1994) ("The history of the privilege against self-incrimination at common law has long been a murky topic."). The conventional view, originally proposed by John Wigmore and later developed by Leonard Levy, is that the origins of the right may be traced to sixteenth-century English protestant objections to the infamous *ex officio* oaths administered by the Star Chamber and the ecclesiastical Court of High Commission, which had required suspects to swear in advance to answer truthfully to questions about their religious and political beliefs. The practice forced the suspects either to lie under oath and thereby risk eternal damnation or to refuse to take the oath and thereby risk less eternal, but no less objectionable, temporal punishment (for example, being whipped and pilloried). Puritans, in particular, claimed the benefit of the ancient maxim *nemo tenetur prodere seipsum* ("no man is obligated to accuse himself") and refused either to swear or to testify. *See generally* John Henry Wigmore, 8 *Evidence in Trials at Common Law* § 2250, 267-89 (John T. McNaughton rev ed 1961); Leonard W. Levy, *Origins of the Fifth Amendment: The Right Against Self-Incrimination* (1968). In 1641, Parliament sided with the Puritans and abolished the courts of Star Chamber and

9

High Commission and forbade the ecclesiastical courts from employing the *ex officio* oath. The fall of the Star Chamber came to be seen as a triumph of the *nemo tenetur* principle.[2]

More recently, scholars have questioned the thesis that the right against self-incrimination represents a simple confirmation of the common-law *nemo tenetur* principle.[3] Those scholars have suggested that, instead, the history of the right consists of

---

[2]   As Wigmore put it:

> "It begins to be claimed, flatly, that *no man is bound to incriminate himself* on any charge (no matter how properly instituted) or *in any court* (not merely in the ecclesiastical or Star Chamber tribunals). Then this claim comes to be conceded by the judges  * * *  even on occasions of great partisan excitement[.]  * * *  By the end of Charles II's reign [1685], * * * there is no longer any doubt, in any court[,]"

as to the existence of the principle. 8 *Evidence in Trials* § 2250 at 289-90 (emphasis in original).

[3]   John Langbein, working from English sources, found scant evidence that courts recognized a right against self-incrimination before the end of the eighteenth century, much later than Wigmore and Levy asserted that the claim was recognized at common law. Langbein, 92 Mich L Rev at 1047. Langbein asserted that the right did not achieve prominence until rules of criminal procedure were fundamentally altered to permit defendants to be represented by counsel (before the late-1700s, criminal defendants were required to defend themselves without the benefit of counsel). *Id.* at 1068-69, 1083-85. Henry E. Smith similarly traced the origins of the right to nineteenth-century changes to the rules of evidence in English criminal cases. Henry Smith, *The Modern Privilege: Its Nineteenth-Century Origins*, in *The Privilege Against Self-Incrimination: Its Origins and Development* 145 (1997). Eben Moglen, focusing on early modern criminal procedure in this country, concluded that, consistently with the work of Langbein and Smith, colonial criminal procedure actually depended on self-incrimination and that the common-law *nemo tenetur* privilege was understood merely to prohibit requiring a defendant from being examined *under oath*. Eben Moglen, *Taking the Fifth: Reconsidering the Origins of the Constitutional Privilege Against Self-Incrimination*, 92 Mich L Rev 1086, 1100 (1994). Katharine Hazlett, beginning where Moglen left off,

10

a more complex convergence of a number of common-law antecedents that had fairly limited effect until the late-nineteenth century.[4]

Although scholars may debate the precise genealogy of the privilege, they do not appear to debate its animating principle, namely, an aversion to compelled testimony. Levy, for example, emphasized that the "traditional English formulation of the right against self-incrimination" pertained to a right "against *compulsory* self-incrimination. The element of compulsion or involuntariness was always an essential ingredient of the right." Levy, *Origins of the Fifth Amendment* at 327-28 (emphasis in original); *see also* Eben Moglen, *Taking the Fifth: Reconsidering the Origins of the Constitutional Privilege Against Self-Incrimination*, 92 Mich L Rev 1086, 1100 (1994) (*nemo tenetur* privilege concerned "the inappropriateness of physical and spiritual

---

traced the development of what is now understood to be the modern privilege against self-incrimination to the fusion of two common-law rules of evidence -- the witness privilege, which prohibited a *nonparty* from being compelled to give self-incriminating testimony, and the confession rule, which excluded a *party's* confession that had not been voluntarily elicited. Katharine B. Hazlett, *The Nineteenth Century Origins of the Fifth Amendment Privilege Against Self-Incrimination*, 42 Am J Legal Hist 235 (1998). Hazlett places the origins of the modern understanding of the privilege -- a right against self-incrimination that applies to parties and nonparties in both criminal and civil proceedings -- in the mid- to late-nineteenth century. *Id.*

[4] Hazlett, for example, notes that "it was not until 1854, more than eighty years after the adoption of the fifth amendment, that a federal case even *mentions* the constitution in the context of the privilege against self-incrimination." Hazlett, 42 Am J Legal Hist at 240 (emphasis in original). *Boyd v. United States*, 116 US 616, 6 S Ct 524, 29 L Ed 746 (1886), is regarded as the first decision to hold that a state or federal statute requiring defendants to produce evidence upon request violated the Fifth Amendment privilege. Hazlett, 42 Am J Legal Hist at 252-60.

11

coercion[,] * * * casting weight onto the scale against the practice of judicial torture").

Nineteenth-century treatises emphasize that the point of the right is freedom from compulsion. One, for example, explains that "[t]he prisoner is not to be examined upon oath, for this would be a species of duress, and a violation of the maxim, that no one is bound to criminate himself." Thomas Starkie, 2 *A Practical Treatise on the Law of Evidence* 51-52 (1826) (footnote omitted).[5]

Early-nineteenth century cases on the constitutional right against self-incrimination likewise reflect a uniform focus on compulsion. The Supreme Judicial Court of Massachusetts, for example, explicitly concluded that the scope of the right against self-incrimination extended only to compelled testimony in *Commonwealth v. Drake*, 15 Mass 161 (1818). In that case, the defendant had been convicted of lewd conduct, based on a confession that he had made openly at his church. Following his conviction, he moved for a new trial on the ground that his confession could not

---

[5]     The concern with avoiding compelled testimony dates back much earlier. Early colonial magistrates, for example, saw a direct connection between the prohibition against compelling individuals to give sworn testimony against themselves and deriving testimony by means of torture. As John Winthrop reported, "examination by oath or torture in criminal cases" was "generally denied to be lawful." John Winthrop, 2 *The History of New England from 1630 to 1649*, at 56 (James Savage ed. 1853). The equation of compelling testimony by oath and by torture may seem foreign to modern sensibilities, but it must be recalled the seriousness with which sixteenth and seventeenth-century protestants regarded the giving of oaths. *See, e.g.*, Moglen, 92 Mich L Rev at 1100 ("To the modern mind, the oath in the legal process is merely a formal ritual, reminding the witness of the possibility of secular punishment for perjury. But this is merely the last step in the withering away of the Christian world's favored instrument of spiritual coercion.").

constitutionally be used against him. *Id.* The trial court denied the motion, and the defendant appealed. The solicitor general, defending the lower court's decision, argued that "[t]he declaration of rights has provided that no subject shall be compelled to accuse or furnish evidence against himself. Here [there] was no compulsion. The confession was purely voluntary." *Id.* at 162. The Supreme Judicial Court agreed, holding that, as long as the confession was "purely voluntary," it was admissible. *Id.*

To similar effect is the Arkansas Supreme Court's decision in *State v. Quarles*, 13 Ark 307 (1853), in which the court explained that the constitutional right against self-incrimination provides "only that the witness should not be compelled to produce the evidence to prove himself guilty of [a] crime." *Id.* at 311. The right, the court explained, "is founded upon the general sense of enlightened men, that compulsory self-accusation of crime is not only at war with the true charities of religion, but has been proven to be impolitic by the truths of history and the experience of common life." *Id.* Compelled testimony, the court reasoned "would not be voluntary * * * and for that reason could never be lawfully used against" the defendant who is required to testify against himself or herself. *Id.* at 314. *See also Jordan v. The State of Mississippi*, 32 Miss 382, 386-87 (1856) (under the state constitutional prohibition against self-incrimination, "the question, and the only question which can be considered is, whether the confession was voluntary"); *State v. Hobbs and Strong*, 2 Tyl 380, 383 (Vt 1803) (under state constitutional right against self-incrimination, "all compulsory process to enforce an acknowledgement of guilt is for ever excluded, not only from our judicial proceedings, but all attempts of individuals to extort confession by bodily suffering is

13

reprobated").

Those cases were consistent with -- and, indeed, sometimes openly borrowed from -- the common-law confession rule, which held that confessions obtained by coercion were inadmissible in evidence. *See, e.g.*, *Wilkins v. Malone*, 14 Ind 153, 156 (1860) ("The constitutional provision [the right against self-incrimination] is thoroughly interwoven with the history and principles of the common law."). As one early nineteenth-century evidence treatise explained, "a confession, forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape, when it is to be considered as the evidence of guilt, that no credit ought to be given to it[.]" Simon Greenleaf, 1 *A Treatise on the Law of Evidence* § 219, 254 (1st ed 1842) (reprint 1972).

Thus, for instance, the New York Court of Appeals explained in *People v. McMahon*, 15 NY 384 (1857), that, while the civil law freely relies on confessions, "[t]he common law, on the other hand * * * regards this species of evidence with distrust." *Id.* at 385. The rationale was that coerced confessions were not reliable; the common law, it was understood, "carefully scrutinizes the circumstances, and rejects the evidence if it sees that no safe inferences can be drawn from it." *Id.*

In that regard, it perhaps bears noting that, at common law, testimony obtained by means of pretext or deception was not regarded as having been compelled. As Greenleaf explained in his treatise on evidence, a confession may be admissible "though it were induced by * * * any *deception* practi[c]ed on the prisoner, or false representation made to him for that purpose, provided there is no reason to suppose that the inducement held out was calculated to produce any untrue confession[.]" Greenleaf,

14

1 *A Treatise on the Law of Evidence* § 229 at 322 (emphasis in original).  Thomas Starkie's evidence treatise similarly explains, with a citation to a well-known English case, *Rex v. Burley* (1818), *reprinted in Selected Cases from the Twelve Judges' Notebooks* 118-19 (D.R. Bentley Q.C. ed., 1997), that a prisoner may be "convicted upon his own confession, even although it had previously been *falsely* represented to him by a constable that his accomplices were in custody."  Starkie, 2 *A Practical Treatise on the Law of Evidence* at 49-50 (emphasis in original; footnote omitted).  *See also Rex v. Shaw*, 6 Car & P 372, 373, 172 Eng Rep 1282 (1834) (prisoner confessed to fellow prisoner, who falsely promised to keep the confession in confidence; held the confession was admissible); *Rex v. Derrington*, 2 Car & P 418, 419, 172 Eng Rep 189 (1826) (confession obtained by deception is admissible in the absence of evidence that it was obtained by threats).

Antebellum American cases were consistent on that point as well, often with a citation to *Burley* or *Derrington*.  *See, e.g.*, *Rutherford v. Commonwealth*, 59 Ky (2 Met) 387, 391 (1859) (prisoner's confession obtained by deception admissible, unless induced by a false promise of freedom); *Fife, Jones, and Stewart v. The Commonwealth*, 29 Pa 429, 436 (1857) (citing *Burley* for the rule that confessions obtained by "artifice" are admissible, the only limitation being whether the confession was voluntary, that is whether there was involved any "intimation of an intention in any quarter, to punish or injure her if she refuses to confess"); *Gates v. The People*, 14 Ill 433, 437 (1853) ("And confessions may be received in evidence though induced by deception practiced on the prisoner, or by false representations made to him for the purpose[.]").

15

In short, the evidence of the historical circumstances of the adoption of Article I, section 12, in the mid-nineteenth century reveals that the constitutional right against self-incrimination generally was understood to limit the means by which the state may obtain evidence from criminal defendants by prohibiting compelled testimony.[6] In our examination of the historical record, we have found a complete absence of evidence of the recognition of a constitutionally protected "right to remain silent" that exists independent of compelling circumstances.[7] With that summary of the historical sources in mind, we turn to the Oregon case law construing Article I, section 12.

---

[6] As one historian recently summarized the evidence, the historical sources show that the right against self-incrimination was understood to prohibit

"(1) incriminating interrogation under oath, (2) torture, and (3) probably other forms of coercive interrogation such as threats of future punishment and promises of leniency. The amendment prohibited nothing more, or at least the sources mention nothing more. The self-incrimination clause neither mandated an accusatorial system nor afforded defendants a right to remain silent. It focused on improper methods of gaining information from criminal suspects."

Albert W. Alschuler, *A Peculiar Privilege in Historical Perspective*, in *The Privilege Against Self-Incrimination* at 192 (footnotes omitted).

[7] In fact, the first mention of a constitutional "right to remain silent" occurs in an 1894 New York Court of Appeals case, *People ex rel. Taylor v. Forbes*, 143 NY 219, 229-30, 38 NE 303 (1894), and, even then, the court emphasized that "the object of the constitutional provision was to insure [*sic*] that a person shall not be compelled" to give self-incriminating testimony. There is a slightly earlier mention of a defendant's "right to remain silent" in the summary of the arguments of counsel in *Commonwealth v. Sturtivant*, 117 Mass 122, 128 (1875). In that case, the defendant objected to the admission of a confession that he had given during an interview with a constable. The court, however, disposed of the contention summarily with the observation that "[n]o inducement or influence of any kind appears to have been used to obtain the confession." *Id.* at 139.

16

### 3. Oregon Case Law

From very early on, this court's cases held that the focus of Article I, section 12, is whether a defendant's testimony was compelled, or, conversely, whether it was voluntarily given. In *State v. Andrews*, 35 Or 388, 391, 58 P 765 (1899), for example, the court explained that, under Article I, section 12, "before the confessions of a defendant can be received in evidence in a criminal action, it must appear that they were voluntarily made." The court cited as authority an earlier case, *State of Oregon v. Moran*, 15 Or 262, 265, 14 P 419 (1887), which, in turn, relied on the common-law confession rule that confessions are admissible as long as voluntarily obtained.

In *State v. Morris*, 83 Or 429, 473, 163 P 567 (1917), the court similarly emphasized that, under Article I, section 12,

"[i]t is incumbent upon the prosecution to show that the statement relied upon was free and voluntary, and if it should appear that any inducement or compulsion in any appreciable degree enters as an ingredient into the transaction, it vitiates the whole, and its admission in evidence is an abuse of the defendant's constitutional right for which a conviction should be reversed."

Some 20 years later, in *In re Jennings et al.*, 154 Or 482, 59 P2d 702 (1936), the court alluded to the historical underpinnings of the right against self-incrimination. Citing Wigmore and quoting from an article by Chief Justice William Howard Taft on the subject, the court noted that the right,

" 'if traced back to its original source, had reference to a system of torture which did prevail in the time of the early English kings, and which was intended to denounce, not the mere calling of a defendant to testify and inviting him by questions so to do, but the actual compulsion of evidence by physical means.' "

*Id.* at 495 (quoting William H. Taft, *The Administration of Criminal Law*, 15 Yale LJ 1, 9 (1905)).

A decade later, this court again relied on the common-law underpinnings of Article I, section 12, to determine that a defendant's right against compelled self-incrimination was not violated when the police, without a defendant's consent, took a blood sample and submitted evidence regarding the blood alcohol content of that sample at the defendant's trial. *State v. Cram*, 176 Or 577, 579-82, 593, 160 P2d 283 (1945). " '[N]either limiting nor enlarging' " the " 'common-law rule ' " embodied in Article I, section 12, the court held that using that evidence did not "compel[ him] to testify against himself[,]" and, therefore, the admission of the evidence did not violate section 12. *Id.* at 581, 593-94 (quoting Burr W. Jones, 6 *Commentaries on the Law of Evidence* § 2472, 4900 (2d ed 1926)).

The court emphasized that compulsion is the principal underpinning of the protection in *State v. Mendacino*, 288 Or 231, 603 P2d 1376 (1980). "Before a confession can be received in evidence," the court explained,

> "the state must show that it was voluntarily given, that is, made without inducement through fear or promises, direct or implied. This has been the rule in Oregon for almost a century. A compelled confession is offensive not because the victim has a grievance against the police, but because coerced statements are not premises from which a civilized society will infer guilt. The Oregon Constitution embodies these principles by guaranteeing that no person shall be compelled in any criminal prosecution to testify against himself."

*Id.* at 235-36 (citations omitted).

The court again addressed the scope of the right against self-incrimination

18

in *Sparklin*, 296 Or 85. In that case, the defendant had been arrested on a charge of forgery after security personnel at a retail store notified police of their suspicion that the defendant and a companion had purchased merchandise with a stolen credit card. *Id.* at 87. At his arraignment, he requested an attorney and was provided with one. Police meanwhile obtained information that implicated the defendant in an unrelated robbery and murder. Two detectives, without providing the defendant an opportunity to consult with his attorney, gave the defendant *Miranda* warnings and proceeded to question him about the other crimes. Defendant signed a waiver of his *Miranda* rights and confessed to the murder. *Id.* He was then charged, tried, and convicted of the murder based, in part, on the confession. On appeal, the defendant argued that the confession should have been suppressed under Article I, section 12. He argued that his request for an attorney at arraignment triggered his right against self-incrimination, as well as his right to counsel under Article I, section 11. *Id.* at 89.

This court rejected the defendant's self-incrimination argument. "Article I, section 12," the court explained, "forbids the state from compelling a person to testify against himself. *It is compulsion which is proscribed*[.]" *Id.* at 89 (emphasis added). In that case, the court continued, no such compulsion occurred, because the police had informed the defendant of his rights, and he had waived them. The defendant insisted that the fact that he had earlier requested counsel at his arraignment triggered his right against self-incrimination. *Id.* The court rejected that argument as well, because the right had not been invoked at a time when the defendant had been in compelling circumstances. "At arraignment," the court observed, "defendant is not confronted with

19

an atmosphere of coercion, nor does anyone seek to gain admissions from him." *Id.*

More recently, in *State v. Fish*, 321 Or 48, 55, 893 P2d 1023 (1995), this court briefly surveyed the historical underpinnings of the right against self-incrimination guaranteed in Article I, section 12, concluding that, although there appears to be some disagreement about the precise origins of the right, "it is clear that the right originated and continued to develop as a protection against inquisitorial methods of investigation and prosecution." Accordingly, the court emphasized, "Article I, section 12, prohibits the state from *compelling* an individual to provide 'testimonial' evidence." *Id.* at 56 (emphasis in original). In fact, the court summarized the self-incrimination protection afforded by the state constitution in terms of three specific elements: "[T]o receive protection under the self-incrimination clause of Article I, section 12," the court explained, "a person's statement or conduct must (1) be 'testimonial' evidence, (2) be 'compelled,' and (3) be evidence that could be used against the person in a criminal prosecution." *Id.* at 53. *See also State v. Scott*, 343 Or 195, 201, 166 P3d 528 (2007) ("The state constitutional right against self-incrimination and the derivative right to counsel adhere when a suspect is subject to custodial interrogation."); *State v. Terry*, 333 Or 163, 172, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002) ("Article I, section 12, of the Oregon Constitution, requires police questioning to cease only when a defendant is in custody, *i.e.*, not free to leave.").

Of course, the rights guaranteed by Article I, section 12, may be waived. To ensure the validity of any such waiver, this court suggested early on, in *Andrews*, 35 Or at 391-92, that proper warnings may be required. Meanwhile, in *Miranda v. Arizona*,

384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966), the United States Supreme Court decided that, to ensure the validity of a waiver of an individual's right against self-incrimination under the Fifth Amendment, police must warn the individual of, among other things, the rights to remain silent and to be represented by counsel. The Court concluded in *Miranda* that the warnings were required of state law enforcement officials as a requirement of due process under the Fourteenth Amendment. *Id.*

It is important to note, however, that the United States Supreme Court has emphasized that the warning requirement is triggered by *custodial* interrogation, not by the mere assertion of the right against self-incrimination, without regard to whether an individual is in custody or in compelling circumstances. As the Court explained in *McNeil v. Wisconsin*, 501 US 171, 182 n 3, 111 S Ct 2204, 115 L Ed 2d 158 (1991), "[w]e have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation[.]'"[8]

_____

[8] If it were otherwise, the Court explained, there would be

"no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. *Most rights must be asserted when the government seeks to take the action they protect against*. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect."

*Id.* (emphasis added). The lower courts from other jurisdictions have followed suit, often employing the Supreme Court's phrasing of the issue in terms of whether the right may be invoked "anticipatorily," that is, in the absence of custody or compelling circumstances. *See, e.g.*, *U.S. v. Vega-Figueroa*, 234 F3d 744, 749 (1st Cir 2000) ("In order for *Miranda*

21

In the years following *Miranda*, this court has concluded that, under the state constitution, similar warnings are required before a defendant may be questioned while in custody or in compelling circumstances. *See generally Vondehn*, 348 Or at 472-74 (reviewing cases leading to the conclusion that "the Oregon Constitution requires suppression of statements made without the benefit of *Miranda* warnings"). Like the United States Supreme Court, however, this court has always held that the need for warnings is triggered by questioning either in custody or in circumstances short of

rights to be invoked, there must be (1) custody and (2) interrogation."); *U.S. v. Grimes*, 142 F3d 1342, 1348 (11th Cir 1998), *cert den*, 525 US 1088 (1999) ("*Miranda* rights may be invoked only during custodial interrogation or when interrogation is imminent."); *U.S. v. Wright*, 962 F2d 953, 955 (9th Cir 1992) ("The Court has never held that *Miranda* rights may be invoked anticipatorily outside the context of custodial interrogation; we see no reason, apart from those already rejected in *McNeil*, to do so here."); *Russell v. State*, 215 SW3d 531, 536 (Tex Ct App 2007) ("[W]e do not believe existing case law supports the right of an accused to invoke his *Miranda* rights in any context other than a custodial interrogation."); *Wilson v. Com.*, 199 SW3d 175, 179 (Ky 2006) ("[I]t is clear that the Fifth Amendment rights protected by *Miranda* attach only after a defendant is taken into custody and subjected to interrogation. Any attempt to invoke those rights prior to custodial interrogation is premature and ineffective.").

As a matter of state constitutional law, most state courts also hold that the invocation of *Miranda* rights in the absence of custody or compelling circumstances does not preclude police questioning. *See, e.g.*, *State v. Aubuchont*, 147 NH 142, 149, 784 A2d 1170 (2001); *Sapp v. State*, 690 So 2d 581, 586 (Fla), *cert den*, 522 US 840 (1997) (holding that, under the Florida constitution self-incrimination clause, "[a] rule allowing one to invoke the right to counsel for custodial interrogation before it is even imminent (whether it be through a claim of rights form or by any other means) would provide little additional protection against involuntary confessions but would unnecessarily hinder lawful efforts by police to obtain voluntary confessions"). In one jurisdiction, New York, the courts have reached a contrary conclusion, based on a right-to-counsel statute in combination with state constitutional guarantees of rights to counsel and due process of law. *See, e.g.*, *People v. Davis*, 75 NY2d 517, 520-21, 553 NE2d 1008 (1990).

custody that are nevertheless compelling. As the court explained in *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006), "[t]o protect a person's right against compelled self-incrimination under [Article I, section 12], this court has held that, before questioning, police must give *Miranda* warnings to a person who is in 'full custody' or in circumstances that 'create a setting which judges would and officers should recognize to be "compelling." ' " (quoting *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990)).

This court has never recognized an obligation under Article I, section 12, of police to inform a person of a right to remain silent in the absence of custody or other compelling circumstances. Likewise, the court has never held that an individual's invocation of a right to remain silent in the absence of custody or other compelling circumstances precludes police from attempting to obtain incriminating information from that individual.

4.    Application

That leads us to this case, in which defendant asks that this court do so -- that is, hold that his invocation of a right to remain silent some months before he was placed in custody or in circumstances that could be regarded as compelling precluded police from obtaining incriminating information from him during that time. Article I, section 12, simply will not support such a broad interpretation. As we have noted, as a matter of textual analysis, the provision speaks to a right to be free from *compelled* self-incrimination; if there is a right to remain silent that is guaranteed by Article I, section 12, it is a right to insist that the police refrain from interrogation after a person who is in custody or otherwise in compelling circumstances has invoked the right to remain silent.

23

That reading of the text is most likely what the framers of the Oregon Constitution would have understood Article I, section 12, to mean. The constitutional guarantee of a right against self-incrimination, as well as its common-law antecedents, were well and uniformly understood to prohibit only compelled self-incrimination. Moreover, this court has consistently construed the scope of the constitutional guarantee to apply only to questioning while an individual is in custody or otherwise in compelling circumstances. As this court succinctly stated in *Sparklin*, "[i]t is compulsion which is proscribed[.]" 296 Or at 89.

Defendant's arguments in favor of a broader reading of Article I, section 12, do not bear scrutiny. Defendant does not explain how his assertion of a broader "right to remain silent" independent of custody or other compelling circumstances can be reconciled with the text of the constitution, with its history, or with this court's case law. His sole contention is that, in a footnote in *Sparklin*, this court noted that the "investigative stage" of a case is sufficiently important that the right to counsel may be implicated. 296 Or at 92 n 9. According to defendant, the same reasoning should apply to the right against self-incrimination under Article I, section 12.

Defendant's reliance on the *dictum* in *Sparklin* is unavailing. The court's statement concerned the right to counsel under Article I, section 11, not the right against self-incrimination under Article I, section 12. In fact, as we have noted, the defendant in *Sparklin* advanced an argument that the police questioning in that case also violated Article I, section 12, based on the fact that he had invoked his right to counsel at arraignment some time before the police began questioning him, which he said also

24

implicated his right against self-incrimination.  The court rejected the argument because, as in this case, the defendant had invoked the right before he was in compelling circumstances.  *Id.* at 89.  Thus, defendant's reading of *Sparklin* cannot be reconciled with *Sparklin* itself.

With the foregoing principles in mind, the answer to defendant's argument regarding his rights under Article I, section 12, is straightforward.   Police informed defendant that they had received a report alleging that he had sexually abused his step-daughter.  There is no suggestion that, at that time, he was in custody or otherwise in compelling circumstances; to the contrary, defendant concedes that he was not.  A month later, defendant attempted to invoke his right against self-incrimination under Article I, section 12.  Again, however, there is no suggestion that, at that time, he was in custody or otherwise in compelling circumstances; defendant concedes he was not.  Some eight months after that, Detective Kaney employed a measure of subterfuge in obtaining, through pretextual instant messaging and telephone communications with the victim, self-incriminating statements from defendant.  Yet again, however, there is no suggestion that, at that time, defendant was in custody or in compelling circumstances; he concedes again that he was not.  There is no suggestion in this case that defendant's incriminating statements were induced by threats or promises or that in any other way defendant's self-incriminating statements were not voluntarily made.  In short, there is no basis for concluding that defendant's self-incriminating statements were obtained in violation of Article I, section 12.

B.      *Article I, Section 11, Right to Counsel*

We turn, then, to defendant's alternative argument, that the trial court correctly granted his motion to suppress because the police obtained his incriminating statements in violation of his right to counsel under Article I, section 11. As we have noted, defendant's argument on that point in this court is abbreviated; it consists of a single sentence at the conclusion of his brief on review, asserting that "the police investigation was a part of a 'criminal prosecution' to which Article I, section 11, of the Oregon Constitution applies." In the Court of Appeals, defendant was only slightly more thorough in his explanation for his Article I, section 11, argument. He acknowledged that the right to counsel under that provision of the constitution applies only in "criminal prosecutions." Citing the footnote in *Sparklin* that we have previously addressed, defendant contended that the right to counsel under Article I, section 11, should be held to attach "during the investigative stage of a prosecution," that is, any time police initiate contact with a suspect.

The state does not address Article I, section 11, in its brief on review. In its brief to the Court of Appeals it relied on this court's opinion in *State v. Randant*, 341 Or 64, 70, 136 P3d 1113 (2006), *cert den*, 549 US 227 (2007), for the bright-line proposition that the right to counsel under that provision of the state constitution does not attach until a defendant has been formally charged with a criminal offense.

Article I, section 11, of the Oregon Constitution provides that, "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel." Although this court has, in several cases, addressed the point at which the right guaranteed by that provision "attaches," the court has never examined Article I, section

11, in terms of the interpretive analysis set out in *Priest*.

Before engaging in that analysis, we once again emphasize the limited scope of the issue before us: An individual may, at any time, decide to retain counsel and may refuse to speak with police without counsel's presence. The question before us is the extent to which such a decision precludes the police from continuing their criminal investigation of the individual. Specifically, it is whether, under Article I, section 11, a suspect's announcement, *before the initiation of any criminal prosecution*, that he or she has retained counsel and will not speak with police without the presence of counsel precludes the police from nevertheless attempting to obtain incriminating information from the suspect without the participation of counsel.

1.      Textual Analysis

Beginning with the text of Article I, section 11, it may be useful to set out the entire section, as it was originally adopted. *See Hirsch/Friend*, 338 Or at 634 ("[O]ther constitutional provisions are helpful to our textual analysis[.]"); *State v. Cavan*, 337 Or 433, 441, 98 P3d 381 (2004) (examination of constitutional text should include consideration of its context). The full text of the original section provides:

> "In all criminal prosecutions the accused shall have the right to public trial by an impartial jury in the county in which the offen[s]e shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor."

27

Or Const Art I, § 11 (1857).[9] The phrasing of the section is significant in at least three respects pertinent to the issue in this case.

First, all of the rights listed in section 11 arise in the course of criminal "prosecutions." On its face, that appears to connote the idea that the right attaches only upon the initiation of some sort of formal proceeding by the state against an individual. That appears to be the sense in which the word would have been understood at the time of its adoption in the mid-nineteenth century, as well. One relevant law dictionary at the time of the framing of the Oregon Constitution, for example, provides the following definition:

> "PROSECUTION, *crim. law*, is the means adopted to bring a supposed offender to justice and punishment by due course of law. * * * The modes most usually employed to carry them out, are by indictment,* * * presentment of a grand jury, * * * coroner's inquest, * * * and by an information."

Bouvier, 2 *A Law Dictionary* at 306 (emphasis in original). Similarly, the relevant definition of "prosecution" in Webster's dictionary is:

> "[t]he institution or commencement and continuance of a criminal suit; the process of exhibiting formal charges against an offender before a legal tribunal, and pursuing them to final judgment; as *prosecutions* of the crown or of the state by the attorney or solicitor general. *Prosecutions* may be by presentment, information or indictment."

Webster, 2 *An American Dictionary* (emphasis in original).

Second, the rights listed may be invoked not by any "person," but only by

---

[9] Article I, section 11, was amended in 1932 and 1934 by adding other guarantees concerning jury verdicts in first-degree murder trials.

one who is an "accused."  Ordinarily, a reference to an "accused" connotes one who has been formally charged with having committed a criminal offense.  *See* Webster, 1 *An American Dictionary* (defining "accused" to mean "[c]harged with a crime, by a legal process; charged with an offense; blamed").  That the framers of Article I, section 11, likely understood the term to have that ordinary sense is confirmed by the reference in the same provision to the right of an accused "to demand the nature and cause of *the accusation* against him, and to have *a copy* thereof."  (Emphasis added.)  *See* Bouvier, 1 *A Law Dictionary* at 40 (defining "accusation" to mean "[a] charge made to a competent officer against one who has committed a crime or misdemeanor so that he may be brought to justice and punishment").  Clearly, the phrasing of the section contemplates the initiation of some sort of formal proceeding against an "accused" by means of an "accusation" that has been reduced to writing.

Third, each of the rights listed in section 11 pertains to the conduct of a criminal trial.  The opening phrase of the section, in fact, specifies that the accused has the right "to a public trial" in the county in which the offense was committed.  There follows a guarantee of a right to meet witnesses face to face, and to have compulsory process for obtaining witnesses in favor of the accused, both of which clearly refer to the conduct of trial.  It is in that context that section 11 lists among the rights that it guarantees the right "to be heard," apparently during trial, "by himself and counsel."

Taken at face value, then, the scope of the right guaranteed by Article I, section 11, appears to be limited to the right of an "accused" against whom a written "accusation" has been brought "to be heard" by counsel "in a criminal proceeding."  Thus,

29

the bare wording suggests that the right may be exercised at trial or, at the earliest, after formal charges have been filed against a defendant.

2.       Historical Analysis

Article I, section 11, was adopted as part of the original state constitution. Its wording is identical to the wording of Article I, section 13, of the 1851 Indiana Constitution and is, consequently, presumed to have been based on that state's guarantee. Carey, *The Oregon Constitution* at 468. It was adopted without amendment or debate. Burton & Grade, 37 Will L Rev at 517-18. The historical context in which the provision was adopted, however, reveals that the framers most likely understood its scope to be as limited as its text suggests, namely, that the right to the assistance of counsel is limited to the conduct of the trial or, at the earliest, proceedings following formal charges against an accused.

At English common law, a defendant accused of a felony actually was prohibited from being represented by counsel. *See generally* William M. Beaney, *The Right to Counsel in American Courts* 8-9 (1955). Oddly enough, only defendants accused of misdemeanors were permitted the assistance of a lawyer. *Id.*[10] In 1696,

---

[10]       The anomaly did not go unnoticed. Blackstone, for example, asked of the English common-law rule, "[U]pon what face of reason can that assistance [of counsel] be denied to save the life of a man, which yet is allowed him in prosecutions for every petty trespass?" William Blackstone, 4 *Commentaries on the Laws of England* 349 (1769). Several reasons have been advanced for the apparent anomaly. First, the judge was understood to have looked to the interests of the accused in felony cases. Second, the standard of proof was such that counsel for a defendant was thought unnecessary. Third, it was assumed that the defendant was more familiar with his case than would be

30

Parliament enacted The Treason Act, 7 & 8 Wil 3, c 3, § 1, which, among other things, authorized a defendant accused of treason to retain "[c]ounsel learned in the [l]aw."  It was not until 1836 that Parliament enacted legislation extending the right to counsel to all felony defendants,[11] although individual judges had been known to permit felony defendants to obtain privately retained counsel on a case-by-case basis some years before that.  *See* Beaney, *The Right to Counsel* at 9-11.

The American colonies charted a course different from the one taken by Parliament and the English courts.  To be sure, self-representation in criminal cases tended to be common, from very early on.  *See generally* James J. Tomkovicz, *The Right to the Assistance of Counsel: A Reference Guide to the United States Constitution* 13 (2002).  Nevertheless, as early as the mid-seventeenth century, the General Assembly for the colony of Rhode Island enacted a statute that recognized a right "to procure an attorn[ey] to plead any po[i]nt of law that may make for the clearing of his innocencye [*sic*]."  John Russell Bartlett, 2 *Records of the Colony Rhode Island and Providence Plantations, in New England* 238-39 (1857), *quoted in* Beaney, *The Right to Counsel* at 17-18.

Several other colonies later followed Rhode Island in enacting statutory

counsel, and so no intermediary was deemed necessary.  *See* John H. Langbein, *The Criminal Trial before the Lawyers*, 45 U Chi L Rev 263, 307-08 (1978).

[11] An Act for enabling Persons indicted of Felony to make their Defen[s]e by Counsel or Attorney, 1836, 6 & 7 Wil 4, c 114.

31

guarantees to the assistance of counsel in serious criminal cases.  In 1731, the South Carolina legislature enacted a law that guaranteed every person "arraigned or tr[i]ed for any such treason, murder, felony or other capital offen[s]e whatsoever as aforesaid, shall be received and admitted to make his and their full defen[s]e by counsel learned in the law[.]"  Act No 530 (1731), 3 *Statutes at Large of South Carolina 1716-1752*, at 274, 286.  In 1777, North Carolina similarly enacted a law specifying that "every Person accused of any Crime or Misdemeanor whatsoever, shall be [e]ntitled to Council [*sic*] in all Matters which may be necessary for his Defense, as well to Facts as to Law[.]"  Ch 2, § XCIV (1777), reprinted in 24 *The State Records of North Carolina* 48, 73-74 (Walter Clark ed. 1905).  That same year, Massachusetts adopted a statute providing a right to the assistance of counsel for those accused of treason or misprision of treason.  Act of Feb 1, 1777, ch 32, reprinted in 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 615, 617 (1886).  Soon thereafter, the Virginia legislature enjoined the courts to allow a criminal defendant "counsel to assist him at his trial, if he desire it."  Ch LVII (1779), reprinted in 12 *The States at Large; Being a Collection of all the Laws of Virginia* at 340, 343 (William Waller Hening ed. 1823).  A number of colonies included in their charters explicit recognition of a right to the assistance of counsel.  Delaware and Pennsylvania, in fact, included mention of the right in their colonial charters, both of which stated that "all Criminals shall have the same Privileges of Witnesses and Council [*sic*] as their Prosecutors."  Del Charter § 5 (1701); Pa Charter § 5 (1701).  In each case, the scope of the prerevolutionary right to the assistance of counsel was limited to assistance at trial or, at the earliest, after arraignment.

32

Following the Declaration of Independence, a majority of the states adopted constitutions that explicitly recognized a right to the assistance of counsel. Some, like the constitution of Georgia, explicitly tied the right to trial: "[N]o person shall be debarred from advocating or defending his cause before any court or tribunal, either by himself or counsel, or both." Ga Const, Art III, § 8 (1798). New York's constitution similarly stated that, "in every trial on impeachment, or indictment for crimes or misdemeanors, the party impeached or indicted shall be allowed counsel[.]" NY Const, ¶ XXXIV (1777). Others, like the Delaware Constitution of 1792, referred to a right to counsel in "all criminal prosecutions." Del Const, Art I, § 7 (1792); *see also* Md Declaration of Rights XIX (1776) ("[I]n all criminal prosecutions, every man hath a right * * * to be allowed counsel[.]"). Still others, like the Massachusetts Constitution of 1780, adopted slightly different phrasing, referring to a subject's right "to be fully heard in his defence." Mass Const, Part I, Art 12 (1780).

The Sixth Amendment to the federal Constitution, adopted in 1791, followed suit. It states that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defen[s]e." US Const, Amend VI. Notably, the Sixth Amendment, like a number of parallel provisions of existing state constitutions, refers to a right of "the accused" that may be exercised during "criminal prosecutions," which suggests that the focus of the amendment is on the rights of a defendant at trial or, at the earliest, following formal charging.

There is, in fact, general agreement among historians that the Sixth Amendment and its state constitutional counterparts were understood to have a limited

33

scope -- they were originally understood to apply to the conduct of the criminal trial only and, even then, as a guarantee only of the right to *retained* counsel. *See, e.g.*, Tomkovicz, *The Right to the Assistance of Counsel* at 81 ("The historical record suggests that the 'core purpose of the counsel guarantee was to assure' that an accused had the assistance of a trained lawyer 'at trial.' " (quoting *United States v. Ash*, 413 US 300, 309, 93 S Ct 2568, 37 L Ed 2d 619 (1973))); Joseph D. Grano, Rhode Island v. Innis: *A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions*, 17 Am Crim L Rev 1, 26 (1979) ("History * * * reinforces what the sixth amendment's language makes plain[,]" *i.e.*, that it is a "trial guarantee[.]").

That understanding of the right to counsel persisted throughout the nineteenth century. In *State v. Cummings*, 5 La Ann 330, 331-32 (1850), for example, the Louisiana Supreme Court addressed the scope of the constitutional right to counsel in the following terms:

> "It was a reproach to the Common Law of England that prisoners were not allowed the aid of counsel when accused of crimes. Their ignorance and timidity when prosecuted by the high officers of government, their want of self possession when life and liberty was put in jeopardy, rendered them incapable of defending themselves, and often the greatest injustice and oppression occurred. This led to the guarantee of the right to counsel in our liberal constitutions, and the right should be liberally construed.
>
> "*The moment at which perhaps it is most seasonable and necessary that a person accused of a crime should have aid and counsel, is that when he is about to be put upon his trial for the offence, and to select the jury for his trial*."

(Emphasis added.) *See also In re Bates*, 2 F Cas 1015, 1018 (CCSC 1858) (No 1,099a) (the rights to assistance of counsel and to confrontation of witnesses "are rights which are

34

not contemplated by the constitution in connection with preliminary proceedings"); *Ex parte Craig*, 6 F Cas 710, 711 (CCED Pa 1827) (No 3,321) ("The constitution, by one of its amendments, has secured to every person under a criminal prosecution * * * the privilege of having the assistance of counsel to defend him."); *United States v. Bollman*, 24 F Cas 1189, 1191 n 5 (CCDC 1807) (No 14,622) (the constitutional right to counsel "cannot apply to the stages of prosecution previous to the impanelling [of] a grand jury"); *State v. Keeran*, 5 RI 497, 504 (1858) (the state constitutional guarantee "secures to persons prosecuted for crime certain rights of trial"); *Trulock v. The State of Iowa*, 1 Iowa 515, 519 (1855) ("[T]he constitution guaranties to every person *charged with* [*a*] *crime*, the assistance of counsel." (Emphasis added.)).

In our review of the historical record, we have located no evidence that, before the Civil War, the scope of the constitutional right to the assistance of counsel would have been understood to include assistance before a criminal defendant's arraignment; what limited evidence that exists reveals that the constitutional guarantee was understood uniformly to apply to the conduct of the trial and, perhaps, post-arraignment trial preparation. *See Trulock*, 1 Iowa at 519 (although the guarantee applies only to one "charged with crime," counsel should be appointed thereafter "at such a time, as that he could truly be of aid and assistance to the accused"); *Allen v. The State of Georgia*, 10 Ga 85, 90-91 (1851) (right to compulsory process, in same constitutional provision as right to counsel "in all criminal prosecutions," is triggered "so soon as a party is charged with a crime and bound to answer, or committed for it").

That the right to counsel would have been understood to concern the

35

conduct of the trial is not surprising when it is recalled that, before the Civil War, organized police forces as we know them did not exist, professional prosecutors were rare, criminal investigations of the sort that are familiar today did not occur, and the evidence against a criminal defendant ordinarily was marshalled during the trial itself. *See generally* Samuel Walker, *Popular Justice, A History of American Criminal Justice* 49-80 (2d ed 1998) (describing transformation of American criminal justice system from 1820-1900); Lawrence M. Friedman, *Crime and Punishment in American History* 66-73 (1993) (recounting the "professionalization" of the system of criminal justice during the nineteenth century).[12]  "The Framers," as one leading historian of the Sixth Amendment right to counsel has observed, "had little need to be concerned with a right to counsel in pretrial proceedings because in their time such proceedings were insignificant."  James J. Tomkovicz, *Standards for Invocation and Waiver of Counsel in Confession Contexts*, 71 Iowa L Rev 975, 982 (1986).

As the nature of law enforcement and public criminal prosecution changed

---

[12]    During the colonial era, most criminal cases were prosecuted privately. *See generally* Comment, *An Historical Argument for the Right to Counsel During Police Interrogation*, 73 Yale LJ 1000, 1041 (1964) ("[In colonial America, t]he power of the state was not marshalled against the accused until the trial; there were no police and, though some states seem to have had prosecutors, private prosecution was the rule rather than the exception." (Footnotes omitted.)).  A victim of crime would file a complaint with a local justice of the peace, who would certify the allegation and authorize a constable to make an arrest.  Public prosecutors emerged only gradually, with private prosecutions predominating through the mid-nineteenth century. *See generally* Walker, *Popular Justice* at 29 (reporting that "most criminal prosecutions continued to be privately initiated through the mid-nineteenth century").

in the late-nineteenth and early-twentieth centuries, however, courts began to question whether the scope of the right to counsel should be expanded to accommodate those changes. But it was not until well into the twentieth century that courts began to expand the scope of the right to the assistance of counsel to reach pretrial states of a criminal prosecution. As late as 1955, a leading commentator on the history of the right to counsel commented that, as to the state courts, "[t]he general attitude seems to be that matters antecedent to trial are not essential to the fairness of the subsequent proceeding" and that, as a result, the scope of the constitutional right to counsel was understood to be "bounded by arraignment and judgment[.]" Beaney, *The Right to Counsel* at 127, 129.

Sixth Amendment doctrine similarly began to undergo something of a transformation in response to changes in law enforcement and criminal prosecution. But, again, that transformation did not occur until well into the twentieth century. The United States Supreme Court's decision in *Powell v. Alabama*, 287 US 45, 53 S Ct 55, 77 L Ed 158 (1932), is commonly regarded as the watershed decision in that regard. In that case, the Court concluded that, under the Due Process Clause of the Fourteenth Amendment, an individual in state court who has been charged with the commission of a crime "requires the guiding hand of counsel *at every step in the proceedings against him*." *Id.* at 69 (emphasis added).

In subsequent cases, the Court expanded on the notion that the right to counsel guarantee of the Sixth Amendment and the guarantee of fundamental fairness embodied in the Due Process Clause of the Fourteenth Amendment may require the assistance of counsel at various "critical stages" of a criminal proceeding before the trial

37

itself. *See, e.g.*, *Iowa v. Tovar*, 541 US 77, 80-81, 124 S Ct 1379, 158 L Ed 2d 209 (2004) (the entry of a guilty plea is a "critical stage" to which the right to counsel applies); *United States v. Wade*, 388 US 218, 236-37, 87 S Ct 1926, 18 L Ed 2d 1149 (1967) (post-indictment lineup is a "critical stage"); *Massiah v. United States*, 377 US 201, 205-06, 84 S Ct 1199, 12 L Ed 2d 246 (1964) (post-indictment interrogation by undercover government agent is a "critical stage").

The Court has justified its extension of the right to various post-indictment, pretrial stages by reference to concerns for fundamental fairness and a recognition that the realities of modern criminal procedure often make pretrial assistance of counsel essential to an accused's defense at trial. *See, e.g.*, *Ash*, 413 US at 310 ("This extension of the right to counsel to events before trial has resulted from changing patterns of criminal procedure and investigation that have tended to generate pretrial events that might appropriately be considered to be parts of the trial itself."); *Brewer v. Williams*, 430 US 387, 398, 97 S Ct 1232, 51 L Ed 2d 424 (1977) (assistance of counsel before trial "is indispensable to the fair administration of our adversary system"); *Powell*, 287 US at 57 ("[F]rom the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself.").

But the Court repeatedly has emphasized that such considerations pertain only to the *scope* of the right to counsel, after the right has "attached" upon the initiation of a "criminal prosecution." *See, e.g.*, *Rothgery v. Gillespie County*, 554 US 191, 198,

38

128 S Ct 2578, 171 L Ed 2d 366 (2008) ("The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: 'it does not attach until a prosecution is commenced.' " (quoting *McNeil*, 501 US at 175)); *United States v. Gouveia*, 467 US 180, 187, 104 S Ct 2292, 81 L Ed 2d 146 (1984) (Sixth Amendment "right to counsel attaches only at or after the initiation of adversary judicial proceedings"); *Brewer*, 430 US at 398 (right to counsel attaches when "judicial proceedings have been initiated against [the accused] 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment' " (quoting *Kirby v. Illinois*, 406 US 682, 689, 92 S Ct 1877, 32 L Ed 2d 411 (1972))).[13] And the Court has cautioned against conflating the distinct issues of attachment and scope. *See, e.g.*, *Rothgery*, 554

---

[13] In particular, the Court has held that the right to counsel does not extend to questioning by police that occurs before the accused has been formally charged. Directly on point in that regard is the Court's decision in *Moran v. Burbine*, 475 US 412, 429-30, 106 S Ct 1135, 89 L Ed 2d 410 (1986), in which it concluded that

> "it makes little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation. More importantly, the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any 'criminal prosecutio[n],' U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the 'prosecutorial forces of organized society.' *By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation.*"

(Citations omitted; emphasis added.)

US at 211 (parties should avoid "the mistake of merging the attachment question (whether formal judicial proceedings have begun) with the distinct 'critical stage' question (whether counsel must be present * * *)").

In short, the evidence concerning the historical context within which the framers of the Oregon Constitution adopted Article I, section 11, strongly indicates that the constitutional right to counsel would have been understood to guarantee a right to counsel at trial and, perhaps, some measure of preparation for trial following the commencement of formal adversary proceedings. There is, however, a complete absence of evidence that the framers would have contemplated a right to counsel that extended before a defendant had been formally accused. To the contrary, even when state and federal courts began to extend the right to counsel to stages of a criminal prosecution before the trial itself -- nearly a century after the adoption of the Oregon Constitution -- they uniformly adhered to the conclusion that the text of the guarantee and its underlying purpose could not justify extending the right to encounters before the initiation of formal criminal proceedings.

3. Oregon Case Law

The early Oregon case law following the adoption of Article I, section 11, was entirely consistent with the foregoing summary of the commonly held understanding of the constitutional right to counsel. In *State v. Butchek*, 121 Or 141, 144, 253 P 367, *reh'g den*, 254 P 805 (1927), for example, the defendant walked into the Portland Police Station and told a police officer that he had killed his wife with an ax. Police officers accompanied the defendant to his home, where he had told them that the body remained.

40

The officers found the victim's body at the home about four feet away from a camping ax. *Id.* at 145. Back at the station, defendant reported to a deputy district attorney the details of the offense. After he was later charged and convicted of murder based, in part, on his self-incriminating disclosures to police and the deputy district attorney, the defendant argued that the conviction should be overturned on the ground that he did not have the benefit of counsel during the police questioning at the station. In particular, the defendant argued that, pursuant to Article I, section 11, he was entitled to counsel "in the trial of the case or at any point of the investigation by the state." *Id.* at 152. This court rejected that contention, reasoning that, when the defendant was arrested, charged, and brought before a magistrate, he had been informed of his constitutional right to the assistance of counsel, and that was all that the law required. *Id.* at 153.

When, in the mid-twentieth century, the United States Supreme Court began expanding the right to counsel under the Sixth Amendment right to counsel at "critical stages" after the initiation of adversary judicial proceedings, parties began to raise before this court whether the state constitutional right to counsel under Article I, section 11, is to be even more expansive than the federal right. The court's initial response was to mirror the reasoning of the United States Supreme Court's Sixth Amendment cases.

In *State v. Newton*, 291 Or 788, 790, 636 P2d 393 (1981), for example, the defendant had been arrested for driving under the influence of intoxicants and taken to the county jail, where police asked him to take a breath test. The officer administering the test informed the defendant that he did not have the right to have an attorney present

41

at the test. *Id.* When the defendant was later charged and tried, in part, on the basis of the breath test results, he moved to suppress the test results on the ground that he had been denied his right to counsel under Article I, section 11. The plurality began its analysis by explaining that "[t]he right to counsel attaches to certain evidence-gathering processes which are deemed 'critical stages' of the prosecution as an extension of a defendant's right to representation by counsel in court." *Newton*, 291 Or at 802. According to the plurality,

> "[a]ny pre-trial adversarial contact of the state and a defendant at which some benefit of counsel would be lost if counsel is not present, that is, at which the state's case may be enhanced or the defense impaired due to the absence of counsel, may be considered a critical stage of the prosecution * * *."

*Id.* at 802-03. Yet, the plurality explained, "[n]ot every evidence-gathering procedure is a critical stage." *Id.* at 803. The plurality noted, citing Sixth Amendment case law, that the United States Supreme Court has concluded that "an adversarial contact is a critical stage in the prosecution only after the defendant is formally charged[.]" *Id.* Because the defendant in *Newton* had not yet been formally charged when he was asked to submit to the breath test, "no right to counsel under either constitutional provision had yet attached." *Id.* at 805.

The court continued to tie its Article I, section 11, right to counsel analysis to the United States Supreme Court's Sixth Amendment jurisprudence in *Sparklin*. As we mentioned in our earlier discussion of that decision, the defendant had been arrested and arraigned on a forgery charge. Later that day, police questioned the defendant about an unrelated offense and did so without notice to the defendant's attorney and without an

42

opportunity to consult with counsel. During that interrogation, the defendant confessed to a murder. In the later prosecution for that murder, the defendant complained that the police had obtained the confession in violation of his Sixth Amendment and Article I, section 11, right to counsel. This court rejected the contention, holding that the right to counsel is offense-specific.

The court began its analysis by addressing the point at which the right to counsel guaranteed by Article I, section 11, "begins." *Sparklin*, 296 Or at 92. The court noted that "[t]he state had already initiated a 'criminal prosecution' against defendant and as a result his right to an attorney under [A]rticle I, section 11, arose," consistently with federal Sixth Amendment right to counsel analysis. *Id.* At that point, in a footnote, the court stated that "[w]e are not presented in this case with the question whether the [A]rticle I, section 11, right to an attorney may attach at any time earlier than the federal right." *Id.* at 92 n 9. The court suggested that "[t]here can be no question that the right to an attorney during the investigative stage is at least as important as the right to counsel during the trial itself." *Id.* In any event, the court concluded, the scope of the right guaranteed by Article I, section 11, in " 'criminal prosecutions [is] not limited to "critical stages" of such prosecutions.' " *Id.* (quoting *State ex rel Russell v. Jones*, 293 Or 312, 321, 647 P2d 904 (1982)).

The court then turned to the merits of the matter before it. Addressing the scope of the right to counsel under Article I, section 11, the court held that "the [A]rticle I, section 11 guarantee of an attorney, like the federal counterpart, remains focused on the trial; that is, it is the protection of rights to which a defendant is entitled in the trial itself

43

which the guarantee is intended to preserve." *Sparklin*, 296 Or at 94. Because, "[i]t is the fairness of the 'criminal prosecution' which counsel's presence helps to ensure," the court explained, "[t]he [A]rticle I, section 11 right to an attorney is specific to the criminal episode in which the accused is charged." *Id.* at 95. According to the court in *Sparklin*, the limitations placed on the state's contact with a represented defendant "do not extend to the investigation of factually unrelated criminal episodes." *Id.*

Five years later, in *State v. Spencer*, 305 Or 59, 750 P2d 147 (1988), the court took up the issue left unanswered in the *Sparklin* footnote about whether the right to counsel under Article I, section 11, begins earlier than the filing of formal charges against a defendant. In *Spencer*, the defendant had been arrested for driving under the influence of intoxicants and taken to the county jail, where a police officer asked him to take a breath test. *Id.* at 61. When the defendant asked whether he could consult with counsel, the officer told him that he could not do so. *Id.* The defendant later unsuccessfully moved to suppress the breath test results on the ground that they had been obtained in violation of his Article I, section 11, right to counsel. The Court of Appeals, relying on *Newton*, affirmed. *State v. Spencer*, 82 Or App 358, 728 P2d 566 (1986). This court, however, reversed, holding that *Newton* had been wrongly decided.

The court began by observing that the right to counsel under Article I, section 11, exists only in "criminal prosecutions." *Spencer*, 305 Or at 73. The court noted that, although a plurality in the earlier case had concluded that the point at which a "criminal prosecution" begins is the filing of a formal charge, "[w]e are not persuaded by the *Newton* plurality's reasons for concluding that the right to seek the advice or

44

assistance of counsel under Article I, section 11, attaches only after a formal charge is filed." *Id.* at 74. The court said that, instead, the appropriate beginning point for the existence of the right to counsel is arrest, not formal charging. The court explained:

> "A person taken into formal custody by the police on a potentially criminal charge is confronted with the full legal power of the state, regardless of whether a formal charge has been filed. Where such custody is complete, neither the lack of a selected charge nor the possibility that the police will think better of the entire matter changes the fact that the arrested person is, at that moment, ensnared in a 'criminal prosecution.' The evanescent nature of the evidence the police seek to obtain may justify substantially limiting the time in which the person may exercise his or her Article I, section 11, right, but it does not justify doing away with it."

*Id.*

It is important to note that, although the court in *Spencer* departed from the federal right to counsel doctrine in recognizing that an accused enjoys the right to counsel upon arrest, it adhered to a distinction key to right to counsel analysis under both state and federal constitutions -- namely, the distinction between when the right to counsel commences, or "attaches," and the scope of that right after attachment has occurred. The court in *Spencer* clearly noted that, although the right to counsel under Article I, section 11, attaches upon arrest, the particular circumstances -- the "evanescent nature of the evidence the police seek to obtain," in the case of a DUII investigation -- may justify limiting the exercise of the right. *Id.* at 74.

That distinction was confirmed more recently in *State v. Durbin*, 335 Or 183, 63 P3d 576 (2003), in which this court addressed the scope of the right to counsel after a defendant has been taken into custody for driving into the influence and asked to consent to a breath test. Citing *Spencer*, the court stated that "the right to counsel at that

45

stage of the criminal prosecution is not as broad as the right to counsel that an accused enjoys at trial." *Id.* at 189.

Even more recently, in *State v. Tiner*, 340 Or 551, 135 P3d 305 (2006), *cert den*, 549 US 1169 (2007), this court concluded that the scope of the right to counsel did not include a right to consult with counsel before police photographed a jailed defendant's incriminating tattoos. *Id.* at 563. Indeed, the court expressly concluded that the collection of such evidence "was not a *critical stage* in the prosecution." *Id.* at 564 (emphasis added).

It could be argued that the court's holding in *Spencer* that the right to counsel under Article I, section 11, is triggered upon arrest is difficult to reconcile with the text of Article I, section 11, and its reference to the rights of an "accused" -- that is, one who has been subject to a formal "accusation" that has been reduced to writing -- as well as the historical context for the adoption of that provision, which, as we have described, reveals that it would have been understood to apply, at the earliest, upon formal charging. We need not resolve any such tensions in this case, however, for the prior decisions of this court are consistent that, *at the earliest*, the right to counsel under Article I, section 11, attaches at the time a defendant has been taken into formal custody.

4. Application

That leads us to this case, in which defendant argues that we should extend the Article I, section 11, right to counsel to apply to any police investigation, even before arrest. As the sole authority for that proposition, defendant cites the footnote in *Sparklin*, in which the court suggested the possibility that the right to counsel under Article I,

46

section 11, could attach at some time earlier than the filing of formal charges, as is the case under the Sixth Amendment.

Defendant's reliance on *Sparklin* for the broad extension of the right to counsel under Article I, section 11, that he urges on us is untenable. To begin with, the suggestion in *Sparklin* was just that -- a suggestion. As we have noted, the footnote on which defendant relies begins with the disclaimer that, "[w]e are not presented in this case with the question whether the [A]rticle I, section 11 right to an attorney may attach at any time earlier than the federal right." *Sparklin*, 296 Or at 92 n 9.

Moreover, it must be remembered that the court's suggestion that the "investigative stage" can be as important as the trial itself, referred to the investigative stage *of a criminal prosecution*. The court did not suggest that, as defendant in this case insists, the right to counsel applies any time police contact an individual, even before a prosecution has been commenced. Indeed, the court explained that the basis for its assertion was the text of Article I, section 11, which guarantees a right to counsel "in 'all criminal prosecutions,' [and is] not limited to 'critical stages' of such prosecutions." *Sparklin*, 296 Or at 92 n 9 (quoting *Russell*, 293 Or at 321) (quotation marks omitted).

Aside from that, defendant's argument that we should recognize a right to counsel when invoked in response to any police inquiry because of its "importance" reflects a fundamental misapprehension of the distinction between when a right to counsel commences, or "attaches," and the scope of that right after it has attached. The text of Article I, section 11, makes clear that the right "to be heard by * * * counsel" may be invoked by "an accused" only in a "criminal prosecution." Consistently with that text,

47

this court has concluded that the right to counsel under Article I, section 11, commences upon the initiation of a "criminal prosecution." *State v. Gilmore*, 350 Or 380, 385, ___ P3d ___ (2011); *Randant*, 341 Or at 70; *Spencer*, 305 Or at 74. *After the right attaches*, the court may evaluate the particular circumstances, the nature of the evidence, and the like to determine the scope of the right to counsel. *Tiner*, 340 Or at 564; *Durbin*, 335 Or at 189; *Spencer*, 305 Or at 74. Those considerations, however, do not define when the "criminal prosecution" within the meaning of Article I, section 11, has been initiated.

Turning to the facts of this case, the result is, once again, straightforward. Defendant attempted to invoke an Article I, section 11, right to counsel before he was formally charged with a criminal offense, before he was arrested for having committed a criminal offense -- in fact, some eight months before police elicited the incriminating statements from him. Likewise, at the time when police obtained the statements from him through the artifice of the contrived instant messaging and telephone conversations with the victim, defendant was not under arrest, and no formal charges had been brought against him. In no sense can it reasonably be held that, at the time he made those incriminating statements, he was an "accused" in a "criminal prosecution." In short, in eliciting those statements from him without the benefit of counsel, the police did not violate defendant's right to counsel under Article I, section 11.

The decision of the Court of Appeals is reversed. The order of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

48