Argued and submitted May 6, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings September 30, 2004

STATE OF OREGON,
*Respondent on Review,*

*v.*

GARY DYLAN CAVAN,
*Petitioner on Review.*

(CC 99100124C; CA A111776; SC S50230)

98 P3d 381

Peter Gartlan, Chief Deputy Public Defender, Salem, argued the cause for petitioner on review. With him on the briefs was Peter A. Ozanne, Executive Director.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Rose Jade, Newport, filed briefs on behalf of *amicus curiae* Jury Service Resource Center.

Before Gillette, Presiding Justice, and Durham, Riggs, De Muniz, and Balmer, Justices.**

DE MUNIZ, J.

** Carson, C. J., and Kistler, J., did not participate in the consideration or decision of this case.

**DE MUNIZ, J.**

Defendant, an inmate at the Snake River Correctional Institution (SRCI), was charged with various crimes stemming from his attack on a corrections officer in that institution. A jury convicted defendant of those crimes in a trial that took place in a courtroom located within the confines of SRCI.

Defendant appealed his convictions, arguing that conducting his jury trial within SRCI violated his state and federal constitutional rights to a public trial by an impartial jury. The Court of Appeals concluded that defendant's jury trial was a "public" one as required under Article I, section 11, and that his impartial jury claim was not cognizable under Article I, section 11, pursuant to this court's earlier decision in *State v. Amini*, 331 Or 384, 15 P3d 541 (2000). The court then analyzed defendant's impartial jury claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and concluded that, although holding a trial in a prison setting is an inherently prejudicial practice, defendant's right to due process of law had not been violated because defendant had posed a security risk and the state therefore had an essential interest in conducting the jury trial at that location. *State v. Cavan*, 185 Or App 367, 377, 59 P3d 553 (2002).

We allowed defendant's petition for review. For the reasons that follow, we hold that conducting defendant's jury trial within SRCI for crimes allegedly occurring within SRCI violated defendant's Article I, section 11, right to an impartial jury.[1] We therefore reverse the decision of the Court of Appeals, reverse the circuit court judgment, and remand the case to the circuit court for further proceedings.

We take the following facts from the opinion of the Court of Appeals:

"While defendant was an inmate at SRCI, he attacked a corrections officer and repeatedly hit him with a homemade

---

[1] That section provides, in part, that "[i]n all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed[.]"

sap. At one point during their struggle, defendant bit off a piece of the correction officer's cheek and tried to spit it into the officer's mouth. Other officers arrived and helped subdue defendant. As he was being led away, defendant raised his arm in a 'victory salute.' The state charged defendant with first-degree assault, second-degree assault, fourth-degree assault, assaulting a public safety officer, and being an inmate in possession of a weapon.

"Based on defendant's extensive disciplinary record in the prison system, his involvement in an earlier violent escape attempt at another facility, and the unprovoked nature of this attack, the state proposed holding defendant's trial in a courtroom constructed in the visiting area at SRCI. The state reasoned that defendant would pose a serious safety risk if he were transported to Vale for trial. The state also noted that the assault occurred at SRCI and that '[a]ll but one of the witnesses will be either inmates, corrections officers or [SRCI] staff.' Finding that defendant posed 'a clear and present danger' and citing an 'overriding public interest,' the trial court overruled defendant's objections and decided that it was appropriate to hold the trial at SRCI. After considering the state's evidence, which defendant did not dispute in any substantial way, the jury found defendant guilty on all counts.

"* * * * *

"The record shows that the state has constructed a courtroom in the visiting area at SRCI. The courtroom provides space for the judge, both parties to the dispute, and the jury. Although the general public cannot sit in the courtroom because of its size, members of the public can sit outside the courtroom and view the proceedings through several large windows opening onto the courtroom. The viewing area contains approximately 50 seats for the public. It permits the members of the public who attend to see all of the proceedings. The judge, the witness stand, the jury, and both counsel tables are all visible from the public viewing area. The audio portion of the trial is broadcast to the public by speakers."

*State v. Cavan,* 185 Or App at 369-70 (footnotes omitted).

The record also contains the following pertinent facts. The courtroom at SRCI is located on institutional grounds in the visiting center. Jurors must pass through

metal detectors and have their hands stamped, and must store their personal effects in lockers. The doors are locked behind them. A juror wanting a smoking break must be escorted outside the main gate of the prison.

On appeal to the Court of Appeals, defendant first argued that conducting the jury trial within SRCI violated his right to an impartial jury because the loss of freedom in such an environment is "palpable." "[P]risons are environmentally oppressive places[,]" defendant observed, which "intimidate and evoke fear in laypersons" who "rely on the staff (the state) for their safety and security while in prison." Defendant argued further that a "juror who is fearful and intimidated by a prison facility and who relies on facility officials for [his or] her safety [can]not have an 'impartial' mindset, within the meaning of Article I, section 11." A trial in that environment, defendant argued, gives the jury the impression that the defendant is violent and therefore guilty. He noted further that some of the most notorious defendants in American history—Al Capone, Timothy McVeigh, Charles Manson, and Ted Bundy—all were tried "in a typical courtroom setting[.]"

The state responded that neither the record nor defendant's argument supported a conclusion that the jury actually had been biased by the site of the trial. The state observed that the courtroom "is in an area of the prison generally open to the public [which was] not materially different from any other courtroom." It argued that, in the absence of actual bias, "defendant's right to an impartial jury ha[d] not been diminished." The state further observed that it was unclear whether defendant's claim even was cognizable under Article I, section 11. It argued that certain "shackling" cases,[2] for example, "historically have been decided under the federal Due Process Clause" and that this court had

---

[2] The term "shackling" refers to cases involving defendants who were tried while visibly shackled. The United States Supreme Court noted in *Illinois v. Allen*, 397 US 337, 344, 25 L Ed 2d 353, 90 S Ct 1057 (1970), for example, that such a practice "might have a significant effect on the jury's feelings about the defendant [and] is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." The Court nonetheless upheld the practice when necessary to control a stubbornly uncooperative and disobedient defendant until he or she agrees to behave in the courtroom. *Id.* at 343-44.

explained in *Amini* that the impartial jury clause in Article I, section 11, does not guarantee a defendant a right to a fair trial generally. Instead, Article I, section 11, guarantees a defendant only the right to a jury that will be fair and that will not possess any prejudice or bias towards the defendant.

In any event, the state argued, even if holding the trial at SRCI violated defendant's right to an impartial jury, the state had a countervailing and overriding interest in conducting the trial at that location because defendant's past violent behavior while incarcerated indicated that he "posed a 'clear and present danger' and, [therefore,] 'an overriding public interest' " mandated that he be tried at the correctional facility.[3]

Defendant also argued that conducting his trial in SCRI violated his right to a public trial under Article I, section 11, primarily because "[a] prison is simply not a place where 'the public is free to enter at will.' "[4]

The state responded that the public was able to view the proceedings in this case in person "without any obstruction in its ability to view and hear the events in the courtroom." The state noted that, "[i]n this case, members of the public were welcome to observe the proceedings[,] [t]he windowed area accommodated a large number of people, and any observer was free to come and go." Thus, the state argued, "nothing in the record supports a conclusion that the SRCI site effectively 'excluded' members of the public from viewing the trial."

The Court of Appeals agreed with the state that defendant's trial had been "public" in accordance with Article I, section 11. That court also held that defendant had not presented a cognizable Article I, section 11, claim:

---

[3] The state presented that argument as part of its analysis of federal law, because it assumed that, pursuant to this court's ruling in *Amini*, defendant's claim was not cognizable under Article I, section 11.

[4] Defendant also argued in the Court of Appeals that holding his trial at SRCI violated Article I, section 10, of the Oregon Constitution, which provides, in part, that "[n]o court shall be secret, but justice shall be administered, openly and without purchase[.]" The court concluded that that claim was not preserved, and defendant does not raise it here.

"Decisions that a court makes concerning the way that the trial will be conducted, such as the clothing worn by a defendant, the number of uniformed officers in the courtroom, and the admission of or refusal to admit evidence, may affect the defendant's ability to present his or her case fairly to the jury. Those decisions do not, at their core, implicate juror bias; rather, they go to a defendant's ability to convey the merits of his or her case to the jury in a forum that does not unnecessarily add legitimacy to the state's assertion that the defendant is guilty or unfairly minimize the impact of the defendant's evidence and arguments."

*Cavan*, 185 Or App at 372-73 (footnote omitted). Thus, the court explained, because defendant's challenge really was one related to a decision affecting the "trial process itself," "[i]f defendant has a constitutional challenge to that decision, it is a claim that that decision denied him due process." *Id.* at 373.

The Court of Appeals then analyzed the effect that conducting the trial at SCRI had on defendant's federal due process rights. Relying on *Holbrook v. Flynn*, 475 US 560, 569, 106 S Ct 1340, 89 L Ed 2d 525 (1986) ("shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large"), the court agreed that, under the two-part federal inquiry— whether the challenged practice is "inherently prejudicial" and, if so, "whether an essential state interest justified the decision" to hold the trial at SCRI—the practice of holding a trial in a prison was inherently prejudicial. *Cavan*, 185 Or App at 373-75. It concluded, however, that the state had an essential interest in maintaining security:

"Holding a trial within the walls of a facility designed to segregate violent or dangerous persons from the public at large implies that there is some need for security measures above and beyond those of a normal trial. To be sure, the charges in this case arose out of an incident at the prison, and the jurors could have inferred that the court elected to hold the trial at the prison for administrative rather than safety reasons. But the decision to hold a trial at a prison is such a departure from the ordinary course, and the risk of singling defendant out in some impermissible way is sufficiently great, that we hold that the practice is inherently

prejudicial; that is, holding trials within prison, like shackling, should be permitted 'only where justified by an essential state interest specific to each trial.'

"* * * * *

"Although the state must show that an essential state interest justifies an inherently prejudicial practice, the strength of the required showing will vary with the risk of prejudice that the particular practice poses. Here, the state relies on an essential state interest—security—and the question is whether the security concerns that the state identified justify the decision to hold defendant's trial at SRCI. On that point, we note that, at the time of trial, defendant was 18. Two years earlier, he had been involved in a violent escape attempt from an Oregon Youth Authority facility. As a result of that incident, defendant pleaded guilty to one count of criminal conspiracy, one count of attempted first-degree escape, two counts of second-degree assault, and three counts of third-degree assault. After that incident, defendant was transferred to an adult corrections facility. During his time in the adult facility, defendant has spent 22 of 24 months in segregation because of repeated disciplinary violations. Within that time, he has repeatedly refused to comply with corrections officers' orders. He has attacked another inmate. He has prepared to resist efforts to control his conduct. He has had to be forcibly extracted from his cell by a team of corrections officers. And, in this case, he was charged with possessing a weapon, repeatedly hitting a corrections officer with that weapon, and biting off a piece of the correction officer's cheek."

*Id.* at 375-77. Thus, the court concluded that, in light of defendant's violent history with prison personnel, the trial court had not erred in denying defendant's motion objecting to holding the trial at SRCI. *Id.* at 377.

■      We begin by addressing the question whether defendant's "impartial jury" claim is cognizable under Article I, section 11, of the Oregon Constitution.[5] In that regard, defendant argues that his claim is cognizable under the Oregon

---

[5] Because we resolve defendant's impartial jury claim under the Oregon Constitution, we do not address defendant's other state and federal constitutional arguments.

Constitution because this court's "case law already recognizes his claim, which is a request for a different setting or 'venue' based on the prejudice associated with the prison setting." The state responds that defendant's reading of this court's case law "would open the door to 'impartial jury' claims based on any and all aspects of criminal trials that arguably could lead to bias or identification with one side or the other." The state cites "courtroom design," "arrangement of counsel tables," and "judges' rulings on objections and trial motions" as a few of the potential Article I, section 11, claims that future defendants might raise if defendant's argument here is successful. The state argues that Article I, section 11, was not intended to apply to such claims, but rather was intended to apply only to claims involving actual juror bias.

■ ■    This court previously has engaged in extended analyses of the impartial jury guarantee expressed in Article I, section 11. This case, however, presents an issue of first impression under Article I, section 11, and requires that we revisit the question of the scope of the impartial jury guarantee. When construing original provisions of the Oregon Constitution, this court ascertains and gives effect to the intent of the framers of the provisions at issue. *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54-55, 11 P3d 228 (2000) (quoting *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992)). That intent is determined by (1) analyzing the text and context of the provisions, giving words the same meaning that the framers would have ascribed to them; (2) considering the case law interpreting the provisions; (3) and reviewing the historical circumstances that led to their creation. *Priest*, 314 Or at 415-16. In addition, the court's goal is faithfully to apply the principles embodied in those provisions to modern circumstances as they arise. *State v. Rogers*, 330 Or 282, 297, 4 P3d 1261 (2000).

The text of Article I, section 11, does not conclusively indicate what the framers meant when they stated that "the accused shall have the right to public trial by an impartial jury[.]" Although the words "impartial jury" may seem to have a self-evident meaning in the criminal trial context today, to assess what the framers likely understood those terms to mean, we nonetheless review definitions of those

terms from dictionaries that were available to the framers when they drafted the Oregon Constitution in 1857.

At the time that the framers drafted the Oregon Constitution, John Bouvier's 1839 law dictionary and Noah Webster's 1828 American Dictionary of the English Language were available. *See State v. MacNab*, 334 Or 469, 476, 51 P3d 1249 (2002) (similarly observing). Bouvier's law dictionary did not define the word "impartial." It defined the word "jury," however, as

> "a body of men selected according to law, for the purpose of deciding some controversy. * * * A pettit jury consists of twelve citizens duly qualified to serve on juries, impanelled and sworn to try one or more issues of fact submitted to them, and to give a judgment respecting the same, which is called a verdict."

John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America* 555 (1839). Within its definition of the word "trial," that dictionary also observed:

> "The learned Duponceau has given a beautiful sketch of this tribunal: 'twelve invisible judges,' says he, 'whom the eye of the corruptor cannot see, and the influence of the powerful cannot reach, for they are no where to be found, until the moment when the balance of justice being placed in their hands, they hear, weigh, determine, pronounce, and immediately disappear, and are lost in the crowd of their fellow citizens.' "

*Id.* at 451.

Webster's dictionary defined the word "impartial" as follows:

> 1.  Not partial; not biased in favor of one party more than another; indifferent; unprejudiced; disinterested; as an *impartial* judge or arbitrator.
>
> 2.  Not favoring one party more than another; equitable; just; as an *impartial* judgment or decision; an *impartial* opinion.

Noah Webster, 1 *An American Dictionary of the English Language*, s.v. "Impartial" (Johnson, 1828) (emphasis in original). That dictionary also defined the word "bias," in part, as

"[t]hat which causes the mind to lean or incline from a state of indifference[.]" *Id.*, s.v. "Bias." The word "jury" was defined as "[a] number of freeholders, selected in the manner prescribed by law, empanneled and sworn to inquire into and try any matter of fact, and to declare the truth on the evidence given them in the case." Webster, 2 *An American Dictionary of the English Language*, s.v. "jury." Although the contemporary dictionary definitions are helpful in a general sense, they provide little insight regarding the actual content and scope of the impartial jury guarantee provided in Article I, section 11.

We turn to this court's case law. In *Amini*, this court addressed "whether a jury instruction advising the jury of the consequences of a finding that [the] defendant was guilty except for insanity violated [the] defendant's right to a trial by an impartial jury under Article I, section 11[.]" 331 Or at 386. In addition to resolving that issue, the court also addressed the related question whether Article I, section 11, included "a broad fairness standard for reviewing [the] instruction." *Id.* at 389.

In *Amini* this court observed initially that the impartial jury clause in Article I, section 11, "guarantees only a trial by an impartial jury; it does not mention a fair trial." *Id.* The court then turned to "the historical circumstances that led to the inclusion of the guarantee of trial by an impartial jury[.]" *Id.* The court noted that Article I, section 11, had been adopted "verbatim" from Article I, section 13, of the Indiana Constitution of 1851. *Id.* The court reviewed historical writings by, among others, Coke and Blackstone, and concluded that the history revealed that, "by the eighteenth century, the requirement of an impartial jury reflected several related concerns, including that jurors be honest, that they not be interested in the outcome of the case, and that they be free from influence by the parties, particularly by the state." *Id.* at 391. "The guarantee of trial by an impartial jury" the court continued, "appears to have been intended to prevent an individual who already has formed an opinion or is interested in the outcome of the case from sitting as a juror." *Id.* The court therefore concluded that "the guarantee of trial by an 'impartial jury' means trial by a jury that is not biased in favor of or against either party, but is influenced in making its decision

only by evidence produced at trial and legal standards provided by the trial court." *Id.*

The court then analyzed its case law and concluded that there were "two broad purposes of the guarantee of trial by an impartial jury." *Id.* First, the guarantee was intended "to prevent an individual from serving on a jury who is biased or interested in the outcome of the proceedings." *Id.* Second, the guarantee was intended "to establish the right to a change of venue if pretrial publicity prevents an impartial jury from being drawn from the citizens of the county in which the crime was committed." *Id.*

The court acknowledged, however, that it had "in a few cases in which parties ha[d] challenged either the impartiality of particular members of a venire, or the appropriate venue in light of pretrial publicity, * * * used the phrases 'fair and impartial jury' or 'fair and impartial trial.' " *Id.* at 391-92. The court explained that its "use of the word 'fair' in those situations was merely as a synonym for a jury that was not biased or prejudiced, [and was] not a holding that Article I, section 11, guarantees that every aspect of the trial will be fair." *Id.* at 392. Based on its review of the case law, the court concluded that, "when this court has held that a jury trial must be fair and impartial, it has meant that the jury must not be prejudiced or biased." *Id.* Thus, "[t]he word 'fair,' " the court explained, "has been used as a synonym for impartial, [and has] not [been used] to expand the guarantee of trial by an impartial jury into an unqualified guarantee of a fair trial." *Id.*

The court next addressed the state's request that the court "hold that the guarantee of trial by an impartial jury under Article I, section 11, controls only the composition of the jury panel at the time that it is impaneled" and not after. *Id.* The court refused to so hold, noting that the court had "recognized that it is possible that a juror, who had been impartial at the outset, might be subjected to improper influences or might act during trial in a manner that would compromise his or her impartiality." *Id.*

We think that a fair summary of the foregoing is that, although this court has acknowledged that Article I,

section 11, encompasses a right to a change of venue based on the effects of pretrial publicity on the impartiality of the potential jury pool, this court has not recognized explicitly, as defendant argues, that Article I, section 11, encompasses a criminal defendant's right to a different " 'venue' based on the prejudice associated with the prison setting." However, the court also never has held to the contrary. And, this court has acknowledged the possibility that external factors may influence jurors after they have been impaneled and that such forces may affect the jurors unconsciously. *See, e.g., State v. Montez*, 309 Or 564, 575, 789 P2d 1352 (1990) (citing *Lambert v. Srs. of St. Joseph*, 277 Or 223, 230, 560 P2d 262 (1977)) (trial court must find that jurors will not be consciously or unconsciously biased).

■ In *Amini*, this court concluded that the "impartial jury" guaranteed by Article I, section 11, is one "that is not biased in favor of or against either party, but is influenced in making its decision only by evidence produced at trial and legal standards provided by the trial court." 331 Or at 391. Viewed in its most basic sense, defendant's claim is that the prison environment at SRCI was so overpowering that it was unlikely that the jury would not have been subject to the impermissible influences of that environment. In light of the historical purposes for requiring juror impartiality, which this court previously identified in *Amini*, we conclude that defendant's claim is cognizable under Article I, section 11, of the Oregon Constitution. We now turn to the resolution of defendant's claim. In addressing defendant's claim, we must focus on the nature of the SRCI prison environment and its likely effect on the jury.

■ Defendant advances multiple, related reasons why a jury is unlikely to remain impartial in the SRCI prison setting. First, he argues that a "maximum security prison" setting, such as SRCI, erodes the presumption of innocence because "the setting enfolds the defendant in prison accouterments," thus overpoweringly inferring dangerousness, and ultimately guilt, to the jury. Second, defendant argues that, because a "maximum security prison" setting is so "vastly different from a typical courtroom setting located in a city center," it creates a natural apprehension on the part of lay

jurors. That apprehension, in defendant's view, will cause jurors to rely, to a greater extent than they would in an ordinary courtroom, on the executive branch (that is, the state) for their protection. That reliance, he urges, creates a "unique and impermissible dynamic between the jury and the guards[,]" which makes it more likely that the jurors will believe the testimony of the guards over defendant. That effect, defendant contends, erodes juror impartiality to an impermissible extent and, for that reason, he was entitled to a change of venue as a matter of law.

The state's response is twofold. First, the state contends that defendant's argument does not implicate *actual* juror bias and does not involve a violation of defendant's right to *select* an impartial jury. Thus, the state argues, because the right to select an impartial jury is a part of trial process, *i.e.*, the manner in which a defendant is able to present the merits of his or her case, and this court has held that Article I, section 11, does not include a generalized right to a fair trial, defendant does not present a cognizable Article I, section 11, claim. As noted earlier, however, we reject the state's contention that defendant's claim is not cognizable under Article I, section 11.

Second, the state argues that "defendant failed to establish with any evidence that the prison site was at all likely to compromise the jurors['] impartiality." In essence, the state argues that defendant's assertions about the oppressive nature and likely effect of the prison environment on jury impartiality are mere speculation and, therefore, even if defendant's claim is cognizable, it is not supported by any proof.

It may be, as the state asserts, that claims of this kind often will be fact-specific and will require an extensive evidentiary record and factfinding. This is not such a case, however. The characterization of the SRCI prison environment by defendant or by this court is not a matter of speculation; rather, it is beyond dispute that the SRCI setting "enfolds the defendant in prison accouterments," just as defendant argues. More to the point, however, we refuse to accept the state's underlying (but unstated) premise that, without evidence to the contrary, we should presume that

jurors are indifferent to their surroundings. Our 200-year American jury trial tradition informs us that exactly the opposite is true.

In this case, the Court of Appeals' analysis of defendant's federal due process claim expressed concerns that we think merit repetition:

> "Holding a trial within the walls of a facility designed to segregate violent or dangerous persons from the public at large implies that there is some need for security measures above and beyond those of a normal trial. To be sure, the charges in this case arose out of an incident at the prison, and the jurors could have inferred that the court elected to hold the trial at the prison for administrative rather than safety reasons. But the decision to hold a trial at a prison is such a departure from the ordinary course, and the risk of singling defendant out in some impermissible way is sufficiently great, that we hold that the practice is inherently prejudicial[.]"[6]

*Cavan*, 185 Or App at 375.

---

[6] Our review of similar cases in other jurisdictions indicates that only one jurisdiction, Utah, unequivocally allows trials in prisons. Four jurisdictions completely disallow the practice, while three others limit the practice depending on the nature of the prison facility and safety concerns. *See State v. Lane*, 60 Ohio St 2d 112, 397 NE 2d 1338 (1979) (holding that trials in prison violate defendants' rights to fair trial, public trial, and due process of law); *Vescuso v. Commonwealth*, 5 Va App 59, 360 SE 2d 547 (1987) (holding that trials in prisons violate right to public trial); *Bright v. State*, 875 P2d 100, 109 (Alaska Ct App 1994) (holding that "any decision to hold a trial in a prison must be subjected to the strictest scrutiny, and that decision must be supported by compelling reasons"); *State ex rel Varney v. Ellis*, 149 W Va 522, 524, 142 SE 2d 63, 65 (1965) (concluding that "[h]olding a trial in the office of the jailer, as was done in the instant case, does not, in our opinion, afford an opportunity for a public trial in the ordinary common-sense acceptation of the term public trial"). *See also Howard v. Commonwealth*, 6 Va App 132, 140, 367 SE 2d 527, 532 (1988) (holding that conducting trial in administration building adjacent to prison, as opposed to prison itself, "was not inherently prejudicial"); *People v. England*, 83 Cal App 4th 772, 100 Cal Rptr 2d 63 (2000) (conducting trial on prison grounds, but outside actual prison wires in facility to which jurors could drive directly, did not violate defendant's right to fair trial or public trial); *Foley v. Commonwealth*, 429 Mass 496, 500, 709 NE 2d 794, 797 (1999) (arraignment did not violate right to public trial, because facilities were open to public, but distinguishing arraignment from trial, where other rights may be implicated). *But see State v. Kell*, 2002 UT 106, ¶16, 61 P3d 1019, 1027 (2002) (holding that, "although the trial took place in a courtroom at the prison, the proceedings were in no way closed to the public"); *State v. Daniels*, 2002 UT 2, ¶22, 40 P3d 611, 618-19 (2002) (holding that "trying [the] defendant in a courtroom located inside a prison did not present an unacceptable risk of presenting impermissible factors").

We agree with those concerns and add the following. Courts ordinarily hold criminal trials in courtrooms located within a public courthouse; that location is familiar to, or readily ascertainable by the public, and is a place where the public conducts a variety of governmental business. The public courthouse, and, by extension, the courtroom within, is an important component of the American adversarial tradition. The aura of neutrality that is inherent in the public courthouse is due in large part to the public's perception that the proceedings conducted there are under the control of an independent and impartial judiciary. That aura of neutrality and judicial impartiality contributes to and fosters the public's belief in, and, similarly, the public's own commitment to, impartiality in judicial proceedings.

Unlike the public courthouse, prisons like SRCI are inherently dangerous places that the public, as a general matter, is unlikely to visit. A jury's perception of the neutrality of the proceedings that attend a trial in the public courthouse obviously is diminished when the court convenes a trial within the environs of a prison such as SRCI. Gone is a jury's perception that the proceeding is in the firm control of the impartial and independent judiciary. Instead, the prison environment reminds the jury that the prison houses the most dangerous elements of society, many of whom are moving about within a few feet of the prison courtroom, and that the jury's physical safety, and to a large extent, the trial itself, are in the control of the prison administrators and corrections personnel. Finally, and perhaps more importantly, convening a trial in a prison such as SRCI and not in a courthouse forcefully conveys to a jury the overriding impression of a defendant's dangerousness and we think, by extension, his or her guilt.

The foregoing observations—our own and those of the Court of Appeals—provide the appropriate lens through which to examine the jury trial in this case. Defendant was charged with assaulting a correctional officer employed in the very facility in which the trial was conducted. Thus, the jury had to rely on the prison administrators and the victim's fellow corrections officers for their safety throughout the trial. That, combined with the state's portrayal to the jury that defendant was so dangerous that he could not stand trial

in the public courthouse, created a trial environment that was incompatible with sustaining the level of jury impartiality demanded by Article I, section 11, of the Oregon Constitution. Given that environment, it was insufficient to confine the impartiality inquiry, as the trial judge did, to the pretrial interview of individual jurors. The problem as we have just described it was more generic and could not be remedied in that fashion. We hold that conducting defendant's criminal jury trial in SRCI violated defendant's Article I, section 11, guarantee to an impartial jury.[7]

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[7] Our decision should not be read to prohibit any other kind of court proceeding, such as an arraignment or hearing before a judge sitting without a jury, within a correctional institution.