

# In the Court of Criminal Appeals of Texas

No. PD-0556-23

BRIAN DALE NIXON,

*Appellant*

v.

THE STATE OF TEXAS

On State's Petition for Discretionary Review
From the Fourth Court of Appeals
Medina County

YEARY, J., delivered the opinion of the Court in which KELLER, P.J., and HERVEY, RICHARDSON, KEEL, and SLAUGHTER, JJ., joined. NEWELL and MCCLURE, JJ., concurred. WALKER, J., filed a dissenting opinion.

In the early hours of January 21, 2016, Appellant shot and killed

Tylene Davis and Debra Echtle at Echtle's residence in Medina County.[1] Appellant was later indicted for capital murder by a grand jury and was put to trial in July of 2021. TEX. PENAL CODE § 19.03(a)(7)(A). Over his objection, Appellant's jury trial was held in an auxiliary courtroom housed in the same building as the Medina County Jail and Sheriff's Department. The jury found Appellant guilty, and he was sentenced to life imprisonment without parole. TEX. PENAL CODE § 12.31(a).[2]

The court of appeals reversed Appellant's conviction. It decided that "the trial court setting in the jail courtroom created an unacceptable risk that the presumption of innocence afforded to [Appellant] was eroded." *Nixon v. State*, 674 S.W.3d 384, 396 (Tex. App.—San Antonio 2023). The State then petitioned this Court to review the court of appeals' decision.

After considering the State's petition, the Court granted review to consider: (1) whether the location of the courtroom where Appellant's trial was held was inherently prejudicial to his presumption of innocence; and, if so, (2) whether use of that courtroom was justified by an essential state interest.[3] We conclude that the location of Appellant's

---

[1] At trial, Appellant did not contest that he killed Davis and Echtle but argued instead that he acted in self-defense.

[2] Section 12.31(a) of the Texas Penal Code provides in relevant part: "An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for: . . . life without parole, if the individual committed the offense when 18 years of age or older." TEX. PENAL CODE § 12.31(a)(2).

[3] Specifically, the Court granted review of the following two grounds from the State's petition:

trial was not inherently prejudicial to his presumption of innocence because the jurors need not have interpreted the setting of his trial as a sign that Appellant was either culpable or dangerous. As a result, we reverse the judgment of the court of appeals and remand the cause to that court to consider Appellant's remaining issues on appeal.

## I. BACKGROUND

### A. Appellant's Motion

Prior to trial, Appellant filed a motion to conduct any individual voir dire and the trial itself in the Medina County Courthouse.[4] In his motion, Appellant argued that holding his trial in a courtroom attached

---

1. Is holding a jury trial in the county's designated auxiliary courtroom located in the same public building as the county jail and Sheriff's Department inherently prejudicial to the presumption of innocence?

and:

2. Was the use of the auxiliary courtroom justified when the trial judge's findings support the determination that he sought to: (1) prevent exposing jurors to Appellant in shackles and jail attire, (2) alleviate security concerns, and (3) provide adequate trial facilities?

Because we resolve this case on the State's first ground for review, we need not address the questions presented by its second ground for review.

[4] Appellant's motion stated:

Counsel for Mr. Nixon have learned that the individual voir dire proceedings in this case may be conducted in the courtroom attached to the Medina County Jail, rather than the Medina County Courthouse Courtroom. If this is true, then conducting any such proceedings, regardless of whether it is jury selection, or actual trial on the merits presents a fundamental challenge to the fairness of the jury selection and subsequent trial proceedings by, at a minimum, undermining the presumption of innocence[.]

to the county jail would necessarily "undermine[] the presumption of innocence" analogous to forcing Appellant to appear before the jury in shackles. To support that assertion, Appellant relied upon *State v. Jaime*, 168 Wash. 857, 864, 233 P.3d 554, 557 (2010), in which the Supreme Court for the State of Washington decided that "holding a trial in a jailhouse courtroom is inherently prejudicial" because the "setting is not in a courthouse" and "the setting that replaces the courthouse is . . . decidedly not neutral, routine, or commonplace."

At a later evidentiary hearing, Appellant also introduced a series of photographs intended to prove that the auxiliary courtroom was located inside a correctional facility. The photographs were admitted into evidence without objection. They are attached as an appendix to the court of appeals' opinion, and they may be seen there. *Nixon*, 674 S.W.3d at 400−07.

Appellant called as a witness an investigator with the regional public defender's office who took the photos. According to that witness, the building where the auxiliary courtroom is housed is located on the outskirts of the City of Hondo, approximately twelve blocks from the Medina County Courthouse. The photos show that a sign posted above the entrance to the building read "Medina County Jail[.]" After entering the building through a glass door and passing through an outer vestibule that provides access to restrooms and vending machines, visitors enter a main lobby either through another glass door or a metal detector. The main lobby includes: (1) a reception window for, and entrance to, the Sheriff's Department; (2) doors to two visitation rooms and a multi-purpose room; (3) a jail information window; (4) a door stating

"Authorized Personnel Only[,]" which the witness identified as the entrance to the jail; and (5) a pair of double doors leading into the auxiliary courtroom where Appellant's trial was held. A placard on the entrance to the courtroom reads: "District Court in Session[.]" Along the way, visitors encounter multiple signs advising that cell phones, cameras, recording devices, food or drink, purses, packages, and openly carried handguns are prohibited.

Appellant argued that this all proved that the auxiliary courtroom was located "in a correctional facility" and "not a neutral place to conduct business." According to Appellant, "[i]t is a place where people are incarcerated." He also argued that the State failed to show a "compelling need" to hold the trial in the auxiliary courtroom and that "[c]onvenience is really why we are here."

The State responded that the auxiliary courtroom was not located in a building that was "wholly a correctional facility" but in a publicly accessible building that also housed a correctional facility. In support of its argument, the State called the Sheriff's chief deputy, who testified that the public regularly visits the building in which the auxiliary courtroom is located. He also testified that the facility at times "host[s] meetings [for] Crime Stoppers and other civic organizations." And he noted that other trials had been held in the auxiliary courtroom.

Second, the State argued that, if the trial were held in the Medina County Courthouse, there would be "no good way to keep the jurors from seeing the deputies walk [Appellant] in and out of the building with a deputy at either side of him with shackles on his legs." Addressing similar security concerns, the sheriff's deputy noted "[t]he lack of space"

and the difficulty of keeping the jury and Appellant separated in the County Courthouse. He also noted that there was only one men's restroom on the courtroom level of that building.

At the conclusion of the hearing the judge denied Appellant's motion. He expressed essentially three reasons for denying the motion and holding Appellant's trial in the auxiliary courtroom: (1) security issues; (2) the risk of commingling between the jurors and Appellant, especially given the availability of only one men's room on the courtroom floor of the courthouse; and (3) the lack of technology in the courthouse.[5]

## B. Trial

Jury selection for Appellant's trial began on July 6, 2021, at the Medina County fairgrounds to accommodate a large jury panel under COVID-19 restrictions.[6] According to the record, Appellant appeared at voir dire in civilian clothes and without visible restraints.[7] At the

---

[5] The trial court judge's full remarks were:

I'm going to deny the motion to move [trial] from the courtroom that you are currently sitting in, [defense counsel], along with the defendant. You've made your record and frankly, we'll let somebody upstairs determine whether that's correct or not[.] [B]ut in addition to the security issues and [in] addition to mingling with the jurors, the lack of bathroom facilities, [and] I think we put on the record previously the lack of technology in the old courthouse when we've had the initial argument on this. So for all of those reasons I'm denying it.

[6] The trial court judge noted on the record that "[w]e are selecting this jury at the fairgrounds because of COVID issues and size issues of the courtroom space available to us."

[7] When introducing the parties to the venire, the trial court judge acknowledged Appellant's presence by asking, "Mr. Nixon, could you please stand for us, please?" and stating, "This is Brian Nixon." Prior to trial, the

conclusion of voir dire, Appellant renewed his objection to being tried in the county's auxiliary courtroom. The trial court judge again denied Appellant's motion and granted him a running objection.

After swearing in the jury, the trial court judge noted that proceedings would resume the next morning "in the regular courtroom." He added that others would "give[] . . . instructions about where to come, but it[']s 9:30 tomorrow." The trial court judge did not otherwise comment on the location of the trial, and any other instructions the jurors might have been given about the courtroom's location do not appear in the record. Appellant's trial commenced the following day in the auxiliary courtroom. At the conclusion of a five-day trial, the jury found Appellant guilty of capital murder.

## C. Appeal

Appellant raised four issues on appeal. In his first three points of error, Appellant argued that holding his trial "in the Medina County Jail" violated: (1) his presumption of innocence; (2) his right to due process under the Fourteenth Amendment; and (3) Section 24.012(e) of the Texas Government Code.[8] In his fourth point of error Appellant also

judge had granted Appellant's "Motion to Appear in Street Clothes at All Pretrial and Trial Proceedings in Open Court." The trial court judge had likewise granted Appellant's "Motion to Preclude Mr. Nixon from Being Shackled in Public" and ordered that "The Medina County Sheriff shall ensure that Mr. Nixon does not appear in shackles in open court hearings wherein the public or media may attend. If restraints are ever deemed necessary by the Court in any public hearing, such restraints shall be employed under clothing in a fashion that is not visible." Nothing in the record suggests that law enforcement failed to comply with these orders at voir dire or throughout trial.

[8] At the evidentiary hearing where the photographs of the building in which the courtroom was located were introduced, Appellant argued, for the first time, that holding Appellant's trial in the auxiliary courtroom would

argued that African Americans were under-represented on the venire, in denial of his Sixth Amendment right to have a fair cross-section of the community on the jury panel.

The court of appeals resolved the case on Appellant's first two issues, deciding that: (1) "the trial court setting in the jail courtroom created an unacceptable risk that the presumption of innocence afforded to [Appellant] was eroded[;]" and (2) conducting the trial in that setting was not justified by an essential state interest. *Nixon*, 674 S.W.3d at 396, 399. While the court of appeals first acknowledged that "a trial setting in a building that houses a courtroom and a correctional facility" will not always erode the presumption of innocence, it concluded that "the various markings reminding the jury that the building at issue here has a primary purpose as a jail created an unacceptable risk that the jury would conclude, before hearing any evidence, that [Appellant] [was] too dangerous to transport and must be isolated from society." *Id.* at 396. It further explained that the reasons the trial judge articulated—security, the risk of commingling Appellant and the jury, and lack of technology—failed to "support the furtherance of an essential state interest [sufficient] to justify holding [Appellant's] trial in the Medina County Jail building." *Id.* at 399. Accordingly, the court of appeals

---

violate Section 24.012(e) of the Texas Government Code. TEX. GOV'T CODE § 24.012(e). According to that statutory provision, which Appellant read into the record: "A district judge *may* hear a nonjury matter relating to a civil or criminal case at a correctional facility in the county in which the case is filed or prosecuted if a party to the case or the criminal defendant is confined in the correctional facility." *Id.* (emphasis added). Appellant argued that, by negative implication, Section 24.012(e) prohibits a district judge from hearing jury matters inside a correctional facility. The applicability of that provision is not before us today.

reversed Appellant's conviction and remanded the case for a new trial. The State then petitioned this Court for discretionary review of the court of appeals' decision. We granted review.

## II. APPLICABLE LAW

The Fourteenth Amendment provides, in relevant part, that "[n]o State shall deprive . . . any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV, § 1. This Court has also recognized that "[t]he right to due process of law includes within it the right to a fair trial[.]" *Marx v. State*, 987 S.W.2d 577, 581 (Tex. Crim. App. 1999). And the Supreme Court of the United States has said that "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).

To protect the presumption of innocence, the Supreme Court said, "courts must be alert to factors that may undermine the fairness of the fact-finding process" and "carefully guard against the dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Id.* Although trial judges have broad discretion over courtroom practices, the Supreme Court declared that a practice that is challenged as threatening to the "fairness of the fact-finding process" must be subjected to "close judicial scrutiny." *Id.* at 504. In applying this scrutiny, the Supreme Court also explained, courts must "do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Id.*

In *Estelle v. Williams*, for example, the Supreme Court decided that compelling a defendant to appear before a jury in a jail uniform

violated the Fourteenth Amendment because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.* at 504–05. The Court acknowledged that sometimes visible restraints may be necessary to "control a contumacious defendant[,]" but it explained that "compelling an accused to wear jail clothing furthers no essential state policy." *Id.*[9] In the Court's view, the defendant's clothing was likely to be "a continuing influence throughout the trial[,]" and it posed an "unacceptable risk" of "impermissible factors coming to play." *Id.* at 505.

In contrast, ten years later, in *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Supreme Court decided that the presence of four uniformed state troopers seated directly behind a defendant in the first row of spectators at his trial did not inherently prejudice his presumption of innocence. Justice Thurgood Marshall, writing for the Court, noted that "[t]he chief feature" distinguishing the presence of uniformed security officers from other potentially troublesome courtroom practices was "the wider range of inferences that a juror might reasonably draw from the officers' presence." *Id.* at 569. The Court explained that, although jurors might have interpreted the presence of the troopers as a sign of Flynn's

---

[9] *See also Bell v. State*, 415 S.W.3d 278, 281 (Tex. Crim. App. 2013) (explaining that visible shackling of a defendant at trial is inherently prejudicial to the presumption of innocence and is permissible only if justified by "essential state interests such as physical security, escape prevention, or courtroom decorum") (quoting *Deck v. Missouri*, 544 U.S. 622, 628 (2005)) (internal quotation marks omitted); *Randle v. State*, 826 S.W.2d 943, 944–45 (Tex. Crim. App. 1992) (explaining that "[i]f a defendant timely objects to being put to trial while dressed in prison clothes, he should not be compelled to stand trial in that attire. Such compulsion would violate the defendant's right to a fair trial and his right to be presumed innocent").

culpability or dangerousness, they "might just as easily [have] believe[d] that the officers [were] there to guard against disruptions" from outside the courtroom or "to ensure that tense courtroom exchanges d[id] not erupt into violence." *Id.*

In fact, the Supreme Court said in *Flynn*, "it is entirely possible that jurors [did] not infer anything at all from the presence of the guards." *Id.* Accordingly, the Court concluded that the use of the four troopers did not tend to brand that defendant in the jurors' eyes "with an unmistakable mark of guilt." *Id.* at 571 (quoting *Williams*, 425 U.S. at 518 (Brennan, J., dissenting)).[10] The Court also explained that, in assessing a claim like the one presented there, courts should "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to [the] defendant's right to a fair trial; if the challenged practice is not found [to be] inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.* at 572.

Considering these cases later, in *Marx v. State*, this Court similarly concluded that allowing a thirteen-year-old victim and a six-

---

[10] *See also Compton v. State*, 666 S.W.3d 685, 726 (Tex. Crim. App. 2023) (deciding that the presence of uniformed Texas Department of Criminal Justice employees that "comprised up to one-fourth of the gallery" during the punishment phase of Compton's trial for capital murder did not inherently prejudice his right to a fair trial); *Sterling v. State*, 830 S.W.2d 114, 118 (Tex. Crim. App. 1992) (explaining that the presence of seven uniformed deputies in the courtroom at a jury trial was not inherently prejudicial); *Howard v. State*, 941 S.W.2d 102, 118 (op. on orig. subm.) (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535, 538 n.23 (Tex. Crim. App. 2014) ("[T]his Court cannot hold that the mute and distant presence of twenty peace officers—comprising roughly one-fifth of the spectator gallery—is prejudicial, per se, without some other indication of prejudice.").

year-old witness to testify via closed circuit television in the defendant's trial for aggravated sexual assault of a child was not inherently prejudicial to the defendant's presumption of innocence. 987 S.W.3d at 581–82. The Court observed that the trial court instructed the jury that the procedure was "authorized by statute 'in these types of cases.'" *Id.* at 581. But the Court also noted that, even without such an instruction, the procedure was not inherently prejudicial because the jury could have just as well inferred that the children in that case were generally afraid of testifying "in the courtroom setting" as that they were "fearful of testifying while looking at the defendant." *Id.* (quoting W. LaFave & J. Israel, *Criminal Procedure* § 24.3 at 1015 (2nd ed. 1992)) (internal quotation marks omitted). The Court concluded that the practice did not "tend[] to brand appellant with an unmistakable mark of guilt." *Id.* at 582.

In light of the principles discussed in these cases, we conclude, as did the court of appeals, that when a particular courtroom practice is challenged as having the potential to erode a defendant's presumption of innocence, a court must first decide whether the practice is inherently prejudicial to the defendant's right to the presumption. *Nixon*, 674 S.W.3d at 390. Also, the court should conclude that the setting was inherently prejudicial to the presumption of innocence only if, after exercising "reason, principle, and common human experience[,]"[11] the court determines that the challenged practice would *necessarily* be interpreted by the jury as a sign that the defendant is particularly

---

[11] *Williams*, 425 U.S. at 504.

culpable or dangerous. And if the court draws the conclusion that the challenged practice *is* inherently prejudicial because it will necessarily be interpreted by the jury as a signal that the defendant is culpable or dangerous, the court should then go on to inquire whether the practice was nevertheless justified by an "essential state interest." *Nixon*, 674 S.W. 3d at 390; see *also Bell*, 415 S.W.3d at 281.

### III. ANALYSIS

### A. The Court of Appeals' Conclusion

Before analyzing the first question—whether the practice complained of was inherently prejudicial to the defendant's presumption of innocence—the court of appeals examined three cases from other jurisdictions which, it said, had concluded that holding a trial in a "Jailhouse Courtroom" is inherently prejudicial. *See id.* at 391−93 (examining *Jaime*, 168 Wash.2d at 864, 233 P.3d at 557; *State v. Cavan*, 337 Or. 433, 449, 98 P.3d 381, 389 (2004) ("[C]onducting defendant's criminal jury trial in [the Snake River Correctional Institution] violated defendant's . . . guarantee to an impartial jury."); and *State v. Lane*, 60 Ohio St.2d 112, 115, 397 N.E.2d 1338, 1340 (1979) ("By holding a trial within a prison for an offense committed within that same institution, the constitutional right to a fair trial is abridged in three ways: (1) The presumption of innocence which must attach to the criminal defendant is eroded; (2) there is a major interference with the jury's ability to remain impartial; and (3) the right of the defendant to obtain witnesses is chilled.")). It then examined four cases from other jurisdictions which, it said, had concluded that holding a trial in a "Jailhouse Courtroom" was not inherently prejudicial. *See id.* at 393−95 (examining *Harper v.*

*State*, 887 So.2d 817, 826–27 (Miss. Ct. App. 2004) ("[T]he trial judge did not abuse his discretion in ordering that the trials of these defendants be moved from the courthouse to the Administrative Building at Parchman."); *State v. Daniels*, 40 P.3d 611, 620 (Utah 2002) ("[W]e conclude that the practice challenged in this case was not inherently prejudicial[.]"); *California v. England*, 83 Cal.App.4th 772, 781, 100 Cal.Rptr.2d 63, 69 (2000) ("There simply is no comparison to be made between shackling a defendant and holding trial on prison grounds in accordance with established standards."); and *Howard v. Virginia*, 6 Va. App. 132, 140, 367 S.E.2d 527, 532 (1988) ("[W]e conclude that the location of Howard's trial did not impermissibly suggest that he was guilty of the offense for which he was being tried or otherwise operate to inherently prejudice him.")). After examining the arguments made in these cases from other jurisdictions—some approving of, and some disapproving of—trials in what the court of appeals in this case called a "Jailhouse Courtroom[,]" the court of appeals concluded that holding Appellant's trial in the courtroom at issue here *was* inherently prejudicial to his presumption of innocence. But we do not agree.

## B. The Building that Housed the Courtroom

There is no disagreement in this case that the government building at issue here housed more than one government facility. One of those facilities was a jail, another was the Sheriff's Department, and a third was the auxiliary courtroom. All of these distinct facilities were located within the same building and under the same roof. And, as the photographs present in the record and reproduced as an appendix to the court of appeals' opinion also indicate, the building that contained these

three distinct facilities was labeled on the outside with the words: "Medina County Jail[.]"

The court of appeals observed that "the first thing" that jurors would see as they approached the building where the trial was to take place was the sign that said "Medina County Jail" over the entrance. *Id*. at 395. It noted that there was no indication that the building was an "annex building" which was used for purposes other than to house inmates. *Id*. It expressed concern that the glass doors to the building had signs posted stating that "cell phones, cameras, recording devices, purses and packages" were banned. *Id*. And it concluded that, "under the facts of this case, the various markings reminding the jury that the building at issue here has a primary purpose as a jail created an unacceptable risk that the jury would conclude, before hearing any evidence, that [Appellant] [was] too dangerous to transport and must be isolated from society." *Id*. at 396. But we conclude, in contrast, that these considerations would not have led the jury to necessarily conclude that Applicant must be guilty or dangerous.

### C. No Necessary Personal Implication of Guilt to Appellant

There is no doubt that a reasonably alert juror in this case would have been aware of the proximity of the jail and the sheriff's office to the courtroom. And we do not discount the possibility that a juror may have been initially confused upon arriving for trial at a building labeled outside as "Medina County Jail[.]" Indeed it is *possible* that a juror might have thought that the proximity of the auxiliary courtroom to the jail could suggest that Appellant was either culpable or dangerous.

But jurors need not have necessarily drawn that inference.

Indeed, we are persuaded that average jurors may have more likely understood that the government and the courts use whatever facilities they have available to get their work done, and that the facility where a trial is held ordinarily does not reflect inherently on the guilt or dangerousness of an accused.[12] In this case, we are convinced that jurors would likely have concluded that, while the courtroom was located in a building labeled on the outside with the name "Medina County Jail[,]" the courtroom itself was a separate government facility distinct from the jail.

In addition, jurors would not have been likely to understand the location of the courtroom to necessarily reflect on Appellant's guilt or dangerousness. Neither the sign on the outside of the building, nor even the courtroom's proximity to the jail and the sheriff's office inside, had any inherent tendency to brand Appellant *himself* as unmistakably guilty. The challenged practice here—conducting Appellant's trial in the auxiliary courtroom, which happened to have been housed under the same roof as the jail and the sheriff's office in Medina County—did not necessarily brand Appellant *personally* with an unmistakable mark of guilt. *See, e.g., Jaime*, 168 Wash.2d at 873, 233 P.3d at 562 (Fairhurst, J., dissenting) ("A courtroom is a location, not an accoutrement. Because a courtroom does not serve as an identifier, it does not possess the inherently prejudicial power of a shackle or prison uniform.").

Jurors would also have observed Appellant in civilian clothes and without visible restraints throughout his trial—which, if anything,

---

[12] Indeed, in this very case, the voir dire of the jury was conducted at the Medina County fairground because of Covid-19 concerns.

would have suggested to them that Appellant was *not* an inmate.[13] If jurors had seen Appellant in jail clothing or visible shackles, that might have been an indelible reminder of a defendant's confinement. But Appellant's appearance in civilian clothing would have been likely to dispel any initial confusion jurors might have had because of the location of the courtroom.

This distinction is well illustrated by a simple comparison of *Williams* and *Flynn*. In *Williams*, the Supreme Court focused on the inherent prejudice of compelling a defendant to appear before the jury in a jail uniform and explained that such clothing would constitute a "constant reminder of the accused's condition implicit in such distinctive, identifiable attire[.]" 425 U.S. at 504–05. But in *Flynn*, the presence of additional uniformed guards, even seated directly behind the defendant, did not brand the defendant in the eyes of the court with an unmistakable mark of guilt. 475 U.S. at 571; *accord Marx*, 987 S.W.2d at 581–82. Whatever the jurors may have thought about the location of the courtroom in this case, Appellant points to nothing that would have necessarily tied Appellant *personally* to that location, any more than the judge, the attorneys, and the jurors themselves were tied to it.

### D. The Courtroom was Distinguishable from the Jail and the Sheriff's Office

The court of appeals also seems not to have recognized the natural

---

[13] The record reflects that Appellant was identified in court by his civilian clothing throughout his trial. For example, on the first day of the State's presentation of the evidence, a witness identified Appellant as wearing a green jacket and cream-colored shirt.

distinction between the larger building complex, which also housed a jail and the sheriff's department, and the courtroom itself. *See Nixon*, 674 S.W.3d at 387 (describing the courtroom at issue in this case as "the jail courtroom"). In failing to recognize the distinction, it concluded that "[t]he jailhouse venue vitiates the 'aura of neutrality and judicial impartiality [that] contributes to and fosters the public's belief in . . impartiality in judicial proceedings.'" *Id*. at 396 (quoting *Cavan*, 337 Or. at 448, 98 P.3d at 389). But contrary to the court of appeals' conclusion, and even though it was housed inside the same building where the jail and the sheriff's department were located, the courtroom itself appears to have been a separate facility.

The courtroom does not appear to be within, or even necessarily a part of, the portion of the building dedicated to housing inmates. Nor does the courtroom seem to be indistinguishably connected to the county sheriff's office. And once the jurors were inside the courtroom, they would have encountered the same judge and attorneys they saw at the fairgrounds, where the voir dire proceedings had been conducted. Although the courtroom is housed in a building with a potentially misleading label on the outside, once the jurors were inside the building, the courtroom would appear to them to be separate and distinct from both the jail and the sheriff's office.

Moreover, no photos of the inside of the courtroom are included in the record. And we can find nothing to suggest that the courtroom itself appeared to be anything other than an ordinary courtroom, once inside. Were there something about the inside of the courtroom that would have tied Appellant personally to the jail facility or to the sheriff's

department, it would have behooved Appellant to make the record reflect as much for purposes of appellate review. But we have seen nothing like that in this case.

### E. Other Factors Did Not Suggest Appellant's Guilt

The court of appeals also expressed concern about the signs on the glass doors that jurors would encounter upon entering the building and before reaching the courtroom, as well as about the presence of a machine in the building lobby—the purpose of which seems to have been to "deposit money into an inmate's account" and which was "wrapped in a large image containing handcuffs." *See id.* at 395 ("[J]urors . . . are immediately confronted with glass doors with posted signs stating cell phones, cameras, recording devices, purses, and packages are banned."); *id.* at 396 ("[U]nder the facts of this case, the various markings reminding the jury that the building at issue here has a primary purpose as a jail created an unacceptable risk that the jury would conclude, before hearing any evidence, that [Appellant] is too dangerous to transport and must be isolated from society."). In our view, however, the presence of the various signs—indicating prohibitions on (1) possession of certain items that might present a security risk, (2) cell phones, (3) recording devices, and (4) other items such as purses and packages—has become so ubiquitous on government buildings with a justice system purpose that those measures would have been taken for granted by ordinary jurors. They would not have had any necessary tendency to suggest to the jury the guilt of Appellant. Similarly, the presence of the device designed to facilitate deposits into inmate accounts would not have necessarily been associated with the courtroom or with Appellant, any more than would the presence of the sign outside the building that

said "Medina County Jail[.]"

As the Supreme Court observed in *Flynn* with respect to the presence of additional guards seated behind a defendant: "Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." 475 U.S. at 569. The security measures described in this case are no more, and perhaps even less, onerous than those required to enter many courthouses in this state, or even to attend oral arguments at this Court. Nothing about those measures seems to have necessarily cast an aura of guilt onto Appellant.

## F. No "Continuing Influence" or "Unacceptable Risk" of Influence by "Impermissible Factors"

We also do not think that the labeling on the building in this case, or the proximity of the courtroom to the area in which inmates were housed, was likely to be a "continuing influence" throughout Appellant's trial. *Williams*, 435 U.S. at 505. In *Williams*, the Supreme Court noted that the prejudice inherent in compelling a defendant to appear in jail attire before a jury was a "continuing influence throughout the trial" and that the attire was "not unlike placing a jury in the custody of deputy sheriffs who were also witnesses for the prosecution[.]" *Id.* (citing *Turner v. Louisiana,* 397 U.S. 466, 473 (1965)). According to the Supreme Court, the jail clothing presented an "unacceptable risk . . . of impermissible factors coming into play." *Id.* But here, Appellant was dressed in civilian clothing, and we have seen nothing that would have otherwise indelibly suggested some other connection between Appellant and either the nearby jail facilities or the sheriff's department.

The courtroom utilized here also did not suggest the kind of "unacceptable risk" of influencing the jury with "impermissible factors" that the Supreme Court was concerned about in *Turner v. Louisiana*. In *Turner*, jurors were placed under the charge of, and were "continuously in the company of[,]" two deputy sheriffs who were also key witnesses for the prosecution in the defendant's trial. *Id.* at 469. The Court explained there that it would be "blinking reality not to recognize the extreme prejudice inherent" in those circumstances since "the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of trial." *Id.* at 473–74.

The record in this case suggests nothing like the continuing nature of the prejudice present in either *Williams* or *Turner*. In *Williams*, the defendant appeared before the jury in jail attire throughout the trial. Similarly, in *Turner*, the familiarity between the jurors and the bailiffs/prosecution-witnesses increased the longer the trial went on. But any confusion or distraction caused by the location of Appellant's trial likely decreased as the auxiliary courtroom became more of a familiar space to which the jurors, the judge, the attorneys, and Appellant (dressed in civilian clothing and without visible restraints), returned daily.

### G. A Wide Range of Inferences Unrelated to Guilt or Dangerousness Were Available

The Supreme Court's determination in *Flynn*—that the presence of four uniformed troopers behind the defendant was not inherently prejudicial to the presumption of his innocence—rested on the "wider range of inferences" jurors might reasonably have drawn from the

troopers' presence. 475 U.S. at 569. Those possible inferences included that: (1) "the officers [were] there to guard against disruptions emanating from outside the courtroom"; (2) their presence was "to ensure that tense courtroom exchanges [did] not erupt into violence"; (3) that they were simply "elements of an impressive drama"; or even, the Court concluded, (4) the "jurors [may] not [have] infer[red] any[thing] at all from the presence of the guards." *Id.* An equally wide range of inferences was open to the jurors in this case as well.

For instance, a juror in this case might reasonably have believed that holding Appellant's trial in a courtroom located in the same building as the county jail and sheriff's office: (1) was necessary to ensure courtroom security in a high-profile capital murder trial; (2) that it was a result of COVID-19 pandemic restrictions; (3) that it was the only courtroom space available, given that the trial judge was a visiting judge from out of town;[14] (4) that it was simply preferable to hold trial in a more modern courtroom for the sake of the available technology it provided or consistent climate-control in the summer months; or, finally (5) a juror may have inferred nothing at all from the location of the courtroom.

Holding Appellant's trial in the auxiliary courtroom was not *inherently* prejudicial to his presumption of innocence. *Id.*; *Marx*, 987 S.W.2d at 581. A challenged procedure is inherently prejudicial to the presumption of innocence only if jurors *must necessarily* interpret it as

---

[14] According to the record, at the outset of jury selection the trial court judge introduced himself to the venire panel by saying, "[M]y name is Sid Harle. I'm a visiting judge from San Antonio."

a sign that a defendant is particularly dangerous or culpable. *Flynn*, 475 U.S. at 569; *accord Marx*, 987 S.W.2d at 581. If jurors can reasonably draw a wider range of inferences, not reflecting at all on danger or culpability, then no unacceptable risk of impermissible factors comes into play. *See Flynn*, 475 U.S. at 572 (noting that the reviewing court's role is not to determine whether alternative procedures were possible but to "look at the scene presented to the jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial"); *accord Howard v. State*, 941 S.W.2d 102, 117 (op. on orig. subm.) (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535, 538 n.23 (Tex. Crim. App. 2014); *see also Daniels*, 40 P.3d at 619–20 (holding that conducting a jury trial for the murder of a fellow inmate in a courtroom inside the prison where Daniels was incarcerated was not inherently prejudicial under *Flynn*'s wider-range-of-inferences test).

### H. We Decline to Follow *State v. Jaime*

Appellant relies heavily on the decision of the Washington State Supreme Court in *State v. Jaime*, contending that it was "both analogous [to this case] and persuasive." But for many of the reasons we have already articulated, we decline to follow that decision. In that case, the defendant's jury trial had been held "in a courtroom located in the county jail[,]" which Jaime challenged as inherently prejudicial. 168 Wash.2d at 859, 233 P.3d at 555. In analyzing the question presented there, the court noted that "[w]hen a courtroom arrangement is challenged as inherently prejudicial, the question to be answered is whether an unacceptable risk is presented of impermissible factors

coming into play." *Id.*, 168 Wash.2d at 862, 233 P.3d at 556 (quoting *In re Pers. Restraint of Woods*, 154 Wash.2d 400, 417, 114 P.3d 607 (2005)) (internal quotations omitted). It then stated that "[a] courtroom practice might present an unacceptable risk of impermissible factors coming into play *because of* 'the wider range of inferences that a juror might reasonably draw' from the practice." *Id.* (quoting *Flynn*, 475 U.S. at 569) (emphasis added).

But *Jaime* turns the *Flynn* analysis on its head. Indeed, one of the dissenting justices in *Jaime* observed that, "[w]hile the majority uses [*Flynn*] to support its contention, a closer analysis of the case compels the opposite conclusion." *Id.*, 168 Wash.2d at 873, 233 P.3d at 562–63 (Fairhurst, J., dissenting). The entire purpose of considering whether there is a wider range of inferences that a juror might reasonably draw from a practice is to determine if it "need not be interpreted as a sign that [a defendant] is particularly dangerous or culpable"—because if it need not, then the practice cannot be *inherently* prejudicial. *Flynn*, 475 U.S. at 569.

In *Flynn*, the Supreme Court explained that "'reason, principle, and common human experience,' *Williams*, [425 U.S. at 504], counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." 475 U.S. at 569. It observed that, "[i]n view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate." *Id.* And it concluded that, "[e]ven had the jurors [in that case] been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand

respondent in their eyes 'with an unmistakable mark of guilt.'" *Id*. at 571. We believe the same conclusion is appropriate here.

## IV. CONCLUSION

We conclude that holding Appellant's trial in the auxiliary courtroom located in the same building as the Medina County Jail and Sheriff's Department was not inherently prejudicial to Appellant's presumption of his innocence. We, therefore, reverse the judgment of the court of appeals and remand the cause to that court to consider Appellant's remaining points of error on appeal.

**DELIVERED:**                                          November 20, 2024
**PUBLISH**